SUTTON, Circuit Judge.
On April 20, 1999, fourteen students and one teacher were killed at Columbine High School in Littleton, Colorado. Two students at the school, we eventually learned, were responsible for the killing spree.
On Friday, April 23, 1999, three days after Columbine, a trio of students at Cambridge Junior High School in Cambridge, Ohio reported to the Vice-Principal of the school that Rhys Williams and Zach Dur-bin planned to commit acts of violence at the school. Rhys and Zach had prior criminal records and both were then on juvenile probation. After interviewing the three students, after taking written statements from each of them, after interviewing Zach Durbin (the only one of the two boys at school that day) and after consulting with probation officers, school officials initiated “emergency remov[al]” proceed *632 ings against the two students. As a result, juvenile parole officers took both students into custody at a juvenile detention facility for the weekend. On the following Monday morning, the juvenile court placed both students on house arrest for several days, and they did not return to school for ten days in Zach’s case and for several days in Rhys’s case. According to school officials, the boys stayed home through voluntary decisions of their parents. According to the boys’ parents, the school suspended them for these periods of time. The juvenile prosecutor ultimately did not file charges against Rhys Williams, but he did file an aggravated menacing charge against Zach Durbin. In September 1999, Zach was acquitted of the charge.
In the aftermath of the arrests, the boys and their parents filed constitutional tort claims under 42 U.S.C. § 1983 (along with several state-law claims) against the relevant school officials and law enforcement officers. In particular, they contended (1) that the local officials failed to establish probable cause for the arrests in violation of the Fourth Amendment and (2) that the two boys received school suspensions without due process in violation of the Fourteenth Amendment. The district court rejected these claims and several others as a matter of law. We affirm.
I.
A. Events Preceding the April 23rd Arrest
In April 1999, Rhys Williams and Zach Durbin were fourteen years old and were in the eighth grade at Cambridge Junior High School. Both students had previous criminal problems and were on juvenile probation in April 1999. Rhys also had been disciplined by the school for several incidents of threatening behavior.
On Wednesday, April 21, 1999, one day after the Columbine tragedy, the two boys went to Rhys’s house. While there, they watched television coverage of the Columbine shootings with Rhys’s mother, Gail Allen. At some point that afternoon, Rhys asked his mother what she would do if Rhys and Zach did “something like that.” JA at 469 (Durbin Dep.).
Later that night Zach spoke with a classmate, Kayla Hollins, on the telephone. According to Zach, he merely told Kayla about his conversation with Rhys and Gail Allen earlier in the day. According to Kayla, Zach told her that he was “getting sick of the way things were going” and was planning on bringing a gun to school or bombing the school. JA at 252 (Hollins Test.). Kayla alleged that Zach also said he would kill the “preps” first, JA at 147 (Hollins Recorded Statement) — meaning that he would kill Sadie LePage and that Kayla would be “one of the first to go,” JA at 532 (Hollins Dep. I) — but that he would not hurt Katie Spittle because he liked her, JA at 151 (Hollins Written Statement).
B. Friday, April 23,1999
1. Zach Durbin
On Friday morning of that week, two days after her conversation with Zach, Kayla wrote a note to Sadie LePage, saying that Zach “was going to bring a gun to school and shoot us all because he was sick of bitchy preps.” JA at 152 (LePage Written Statement). Sadie showed the note to Katie Spittle, another classmate. During the lunch period, Sadie and Katie asked Zach whether the contents of the note were true, and he allegedly told them they were, a point that Zach disputes. After lunch, Sadie and Katie told school officials about the threat. They first told Julie Orsini, the guidance counselor, about the note that Kayla had written. Orsini notified Vice Principal William Howell about *633 the matter and relayed her impression that the girls were “visibly shaken up [and] ... feeling threatened.” JA at 576 (Howell Dep.). Howell met with Sadie and Katie individually, and later called Kayla to his office as well. All three girls spoke to Howell about what had happened, then wrote statements in which they described the events of that morning and their interactions with Zach. In Kayla’s statement, she said the following:
I talked to Zac on the phone Wednesday night & he said he was sick of everybody, everyone was getting on his nerves & he & Rhys Williams were talking about bringing a gun to school & he was very serious about the matter [.][H]is other option was planting a bomb & taking everyone out on the first (one) shot. But he had made very clear he would spare Katie Spittle because he liked her. This morning I [said]to Sadie LePage I had spoken to Zac & she asked what about & that is when I wrote Sadie telling her about our (mine & Zac’s) conversation. Half of the note is now gone.

Id.

Sadie said the following in her statement:
I was sitting in first period today and Kayla Hollins wrote me a note that said Zac Durbin was going to bring a gun to school and shoot us all because he was sick of bitchy preps and he was going to start with me because he hated me so much. Then it said that he said it would just be easier to plant a bomb because he could get us all at once. Then in band (second period) I showed Katie Spittle the note because I was scared and she took the note to him at lunch and he said that it was really true, that he was talking to Rhys and they were seriously thinking about it. Zac hates me so much because I broke up with him 1-2 months ago. And he said he was going to spare Katie of all of this because he likes her.
JA at 152.
And Katie said the following in her statement:
This morning in 2nd period (Band) Sadie LePage showed me the note. At lunch I asked Zac if it was really true, and he said yes. He said him and Rhys were talking about it. He pointed to Sadie and said she’s going first. He said he was going to spare me, because he liked me.
JA at 153.
After his meetings with the three girls and after obtaining their statements, Howell contacted Assistant Superintendent James Spisak to inform him of the situation and to begin the emergency removal process with respect to Zach. Spisak agreed that Zach should be removed from the school under § 3313.66 of the Ohio Revised Code because of the “continuing danger” he posed. In an effort to release Zach to an adult, Howell initially tried to reach Zach’s mother, Bobbi LaCross, but she was unavailable. He then called Zach’s probation officer, Jeffrey Hayes, who came to the school. At roughly the same time, Howell notified Officer Randy LePage and Detective Brian Harbin of the City of Cambridge Police Department about the matter.
When Hayes arrived at the school, Howell briefed him about the situation, told him that the police had been notified and showed him the three girls’ written statements. Hayes asked Howell “whether these [girls] were reputable students” because he wanted to determine “whether it was somebody trying to get even with Zach or that type of thing.” JA at 509 (Hayes Dep.). Howell confirmed the credibility of the girls’ statements on the basis *634 of their reputations as students. Hayes then called his supervisor, Jean Stevens, the Chief Probation Officer of Guernsey County, alerting her to the alleged threats, the girls’ statements supporting them, the girls’ reputations with Howell, the credibility of their statements from Howell’s perspective, and the possible police investigation. Hayes told Stevens that Rhys was not at school that day and that police were looking for him. He then recommended to her that Zach be removed from the school. Stevens authorized Hayes to remove Zach from the school and to take him into detention at the Guernsey County Juvenile Probation Department.
At this point, Howell removed Zach from study hall and told him about the girls’ allegations. In response, Zach confirmed that he knew about the note and acknowledged that Rhys (in his presence) had been “joking around” when talking to Gail Allen about the incident at Columbine, JA at 581 (Howell Dep.), but denied the rest of Howell’s accusations, JA at 473 (Durbin Dep.). After the interview, Howell asked Hayes to escort Zach from the school. While Hayes claims that he did not arrest Zach at this point, he acknowledges that Zach was not at liberty to leave and that he handcuffed Zach in conformity with the probation department’s policies. Hayes signed Zach out of the school late Friday afternoon and escorted him to the Guernsey County Probation Department in Byesville. Upon arrival, Zach was shackled and handcuffed to a chair. Eventually, Zach was driven to the Jefferson County Juvenile Detention Facility in Steubenville, where he remained over the weekend until he returned to Guernsey County for his Juvenile Court appearance on Monday, April 26th.
2. Rhys Williams
Rhys was not involved with the investigation that took place at the school on Friday, April 23rd, because he was not in school that day. Stevens claims that neither she nor Hayes ordered Rhys’s arrest, although she admitted that she authorized his detention in a phone call with a Cambridge police officer. Several Cambridge police officers arrived at Rhys’s house on Friday afternoon and informed his mother, Gail Allen, that he had been implicated in a bomb threat. In response, Allen called the probation department. Becky Masters, the probation officer with whom she spoke, confirmed the police officers’ report and asked Allen to bring Rhys to the department. Allen brought Rhys to the probation department in Byesville, where Masters and a transportation officer handcuffed and shackled Rhys. He was eventually driven with Zach to Steubenville, held for the weekend and returned to Guernsey County for an appearance in Juvenile Court on Monday, April 26th.
3. City of Cambridge Police Officers
Captain Randy LePage and Detective Brian Harbin of the City of Cambridge Police Department received a call from Howell on the afternoon of April 23rd. By the time they arrived at the school, however, Hayes and Zach had already departed. Because Sadie was Captain LePage’s daughter, LePage recused himself from any further involvement and Harbin assumed control of the investigation. Harbin collected the written statements that Howell had taken from the three girls, then took a statement from Howell before leaving. He also took more formal statements from each of the girls at the police station later that afternoon. There is no evidence that Harbin ordered Rhys’s apprehension, but Harbin was in charge of the investigation when Cambridge Police Officers arrived at Rhys’s home.
C. Monday, April 26th, 1999
On Monday, April 26th, the earliest day they could appear in juvenile court, Zach *635 and Rhys were returned to Guernsey County. At the ' courthouse, they were separately interviewed by Harbin and later appeared together before Judge Urbanow-icz of the Guernsey County Court of Common Pleas. -Rhys and Zach both were placed under house arrest for a few days at the end of the hearing. Zach was also electronically monitored as part of his house arrest. Later that week, Harbin transferred the results of his investigation to Roy Morris, the Guernsey County Juvenile Prosecutor. Morris reviewed the information and charged Zach with making “menacing threats” in violation of Ohio Revised Code § 2903.21. Adhering to the guidelines for Guernsey County juvenile proceedings, Harbin picked up a written statement of the charge from Morris’s office, signed it, apd filed it with the Clerk’s office. Morris declined to file any charges against Rhys because he believed probable cause did not exist that he had committed, or was about to commit, a crime. Zach appeared before Judge Urbanowicz to face trial for the single menacing charge on September 18, 1999 and was acquitted.
D. Suspension Issue
Rhys and Zach stayed home from school for a period of time following their appearance in juvenile court. Although their parents allege that Rhys and Zach were suspended, the school disputes the point, claiming it never suspended them. Gail Allen acknowledges that she never received official papers concerning a suspension for Rhys, noting that she kept him home from school in excess of a week because she wanted to shield him from a potential backlash by his peers and because she accepted the advice of the school principal who thought it would be in his best interests as a matter of safety.
Bobbi LaCross alleges that Howell asked Zach to sign a paper concerning his-suspension at the courthouse, then told her that he planned to suspend Zach if he was convicted of the aggravated menacing charge. LaCross allegedly asked Howell about the possibility of appealing any suspension, to which he responded that he would mail her the necessary papers. In his brief on appeal, however, Howell states that a “Notice of Suspension” for Zach was prepared on April 26th in accordance with Ohio Revised Code § 3313.66, but the school never took action on the notice, and it never officially suspended him.
When she did not receive any suspension papers, LaCross allegedly called Superintendent Thomas Lodge to inquire about receiving the papers and about the appeal process. She says that Lodge told her “he had got the suspension papers and there was no recommendation for expulsion.” JA at 621 (LaCross Dep.). Lodge, however, claims official suspension papers for Zach did not cross his desk and that he told LaCross that since no suspension was yet filed, “there’s nothing to appeal at this point in time.” JA at 638 (Lodge Dep.). LaCross persisted and alleges that on May 21, 1999, she was able to obtain the original suspension papers. She attempted to file a written appeal on May 24, 1999, but did not receive a hearing, as the school maintained there was no initial suspension from which she could appeal. Howell and Lodge note that a copy of the “Notice of Suspension” was indeed mailed to LaCross in late May 1999, but that without further action the document alone did not constitute an out-of-school suspension.
E. Procedural History
On March 29, 2000, Zach and his mother (Bobbi LaCross) and Rhys and his parents (Gail and David Allen) filed this lawsuit. They asserted a variety of federal-law claims — violation of the boys’ First, Fourth and Fourteenth Amendment rights under *636 § 1983, the existence of city and school customs that caused these constitutional violations and the presence of a civil conspiracy to violate these rights. And they asserted a variety of state-law claims— malicious prosecution, false imprisonment, false arrest, defamation and intentional infliction of emotional distress.
On September 20, 2001, all of the defendants filed motions for summary judgment, which the district court granted. First, the court determined that the defendants had probable cause to detain Rhys and Zach and accordingly rejected their Fourth Amendment claims. Second, the court determined that neither Rhys nor Zach was actually suspended from school and accordingly rejected their Fourteenth Amendment claims. Third, the court concluded that Zach and Rhys could not substantiate their conspiracy claim. Fourth, the court rejected the state false arrest and false imprisonment claims because Rhys and Zach could not prove that their detentions were unlawful. Fifth, the court rejected the state law claim of malicious prosecution because Harbin had reasonable suspicion that Zach had engaged in menacing. Finally, the court rejected the other claims because Rhys and Zach had failed to respond to the defendants’ summary-judgment motion on them.
On appeal, Rhys and Zach challenge the district court’s resolution of their Fourth and Fourteenth Amendment claims. In addition, Rhys appeals his false arrest and false imprisonment claims, and Zach appeals his malicious-prosecution claim.
II.
The customary rules for reviewing a summary-judgment decision apply. We give de novo review to the district court’s decision. Sperle v. Mich. Dep’t of Corr., 297 F.3d 483, 490 (6th Cir.2002). A decision granting summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). And in considering such motions, we give all reasonable factual inferences to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
Public officials who perform discretionary functions “generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Two questions thus arise in this context: Did the government officials violate a constitutional guarantee? And, if so, did the violation involve a clearly-established constitutional right of which a reasonable officer would have been aware? See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In the absence of an affirmative answer to both questions, the constitutional tort claims must be dismissed as a matter of law.
A. Fourth Amendment Claim
The parties share common ground with respect to the Fourth Amendment’s requirements in this area. As a general rule, a law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime. See Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Probable cause means the “facts and circumstances within the officer’s knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.” Michigan v. DeFil- *637 lippo, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Once “probable cause is established,” this Court has added,
an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused. In fact, law enforcement “is under no obligation to give any credence to a suspect’s story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.”
Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir.1999) (citations omitted). At the same time, officers must consider the totality of the evidence “known to them” when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause. Id. at 372. A “mere suspicion” of criminality will not suffice. United States v. Harris, 255 F.3d 288, 292 (6th Cir.2001).
The rub in this case is whether probation officers Hayes and Stevens—the two primary defendants with respect to this claim—had probable cause to take Zach and Rhys into custody on Friday, April 23,1999. In the district court’s view, the “information conveyed in the girls’ written statements was sufficient for the Defendants to have had more than a ‘mere suspicion’ of Williams’ and Durbin’s alleged criminal activities.” Williams v. Cambridge Bd. of Educ., 186 F.Supp.2d 808, 816 (S.D.Ohio 2002). In response to this conclusion, plaintiffs argue that because Hayes and Stevens relied on vague statements the girls made to Vice Principal Howell and did not test the reliability of the statements themselves, they did not have probable cause to detain either of them.
The problem with this argument is that Hayes and Stevens did not merely accept the girls’ three statements at face value. After two of the girls spoke to the guidance counselor, Julie Orsini, about the threats, she passed along the information to Vice Principal Howell and explained that the girls “were visibly shaken up; that—that they were feeling threatened because they had had a correspondence with Zach Durbin concerning threats to them.” JA at 576 (Howell Dep.). Howell in turn spoke to all three girls, then asked each of them to write statements about what had happened. The three girls all conveyed the same essential information to Howell, and their written statements matched their oral statements. The contents of the statements were anything but “kids will be kids” material. According to Sadie LePage: (1) “Zac Durbin was going to bring a gun to school and shoot us all because he was sick of bitchy preps”; (2) “he said it would just be easier to plant a bomb because he could get us all at once”; and (3) “[Zach] was talking to Rhys' and they were seriously thinking about it.” According to Kayla Hollins: (1) “I talked to Zac on the phone Wednesday night & he said he was sick of everybody, everyone was getting on his nerves & he & Rhys Williams were talking about bringing a gun to school”; and (2) “he was very serious about the matter [;] his other option was planting a bomb & taking everyone out on the first (one) shot.” According to Katie Spittle: (1) “At lunch I asked Zac if [the note] was really true, and he said yes. He said him and Rhys were talking about it”; and (2) “[h]e pointed to Sadie, and said she’s going first.”
Only after Howell vouched for the girls’ credibility, and indeed only after Hayes queried whether the girls could be trusted, did Hayes credit this version of the events. In view of Howell’s position as Vice-Principal, Hayes was justified in trusting How *638 ell’s assessment of the three girls’ credibility and in respecting Howell’s superior position for doing so. On top of this information, Howell separately met with Zach, who confirmed that he knew about the original note, but denied the remainder of Howell’s accusations, contending that Rhys (in Ms presence) had been “joking around” when they discussed the Columbine incident with Gail Allen.
On this record, the officers’ investigation sufficed for the task at hand. The question is not whether Zach made these threats but whether the defendants had probable cause to believe that he had made them. In the aftermath of Columbine, the corroborated statements of three girls whom Vice-Principal Howell deemed trustworthy permissibly cemented the probation officers’ probable cause determination — regardless of whether the concern was a shooting/bomb threat or criminal menacing and regardless of whether the suspect himself denied making those threats. At a minimum, the acknowledged statements established probable cause of aggravated menacing, particularly in the environment of that sobering week. See Ohio Rev.Code Ann. § 2903.21 (“No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of another person.... Whoever violates this section is guilty of aggravated menacing.”); see also Cohen v. Dubuc, No. 3:99-CV-2566(EBB), 2000 WL 1838351, at *4 (D.Conn. Nov.28, 2000) (police officer had probable cause to arrest a high school student after three independent witnesses gave statements that, two days after the Columbine tragedy, they heard the student make threatening comments about “shooting up” the school).
Separately, Rhys Williams and his parents argue that the second-hand references to him in the girls’ statements did not establish probable cause for his arrest. “A close review of the girls’ statements,” they argue, “reveals that these students made no claim that they had seen or heard [him] do anything ... [and] only reported that [Zach] told them he had ‘spoken to Rhys about it.’ ” Williams Br. at 33. They also claim that Kayla’s conduct — first reciting her story in a note to a friend two days after her initial conversation with Zach, then trying to tear up the note, then becoming afraid when her story began to spread — shows she exaggerated her accusations.
The evidence, however, cannot be so readily parsed. While we acknowledge that it is easier to dispense with Zach Durbin’s claim than it is to resolve Rhys’s claim as a matter of law, the girls’ statements confirm that Rhys was indeed connected to the matter. Just as importantly, Zach himself confirmed to Vice Principal Howell that he and Rhys were involved in all of the relevant conduct — whether one labels the conduct a plan of violence, a threat of violence or an immature (but menacing) joke gone awry. Having concluded that probable cause existed for the one boy that Friday afternoon, it was reasonable as a matter of law for the probation officers to conclude that it existed for the other. That Rhys was not eventually charged with menacing does not change matters. An arrest grounded in probable cause does not become invalid merely because the State chooses not to prosecute the individual or a jury opts for acquittal. See Criss v. City of Kent, 867 F.2d 259, 262 & n. 1 (6th Cir.1988).
B. Fourteenth Amendment Claim
Plaintiffs separately argue that the school officials violated their due-process rights in suspending them without notice and a hearing. We disagree.
*639 While the Due Process Clause applies to children and to public schools, the Supreme Court has long made clear that the procedural requirements of the Clause have considerably less force when applied to discipline meted out by school officials to students under their care. Unlike juvenile criminal proceedings, for example, hearings in connection with short school suspensions need not “afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident.” Goss v. Lopez, 419 U.S. 565, 583, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Imposing such formalities on a school suspension proceeding would “not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.” Id. Before suspending a student for ten days or less, as a result, all that a school official must do is give (1) adequate notice of the charge against the student, (2) an explanation of the evidence supporting the charge and (3) an opportunity for the student to respond. See id. at 581, 95 S.Ct. 729; Martin v. Shawano-Gresham Sch. List., 295 F.3d 701, 706 (7th Cir.2002) (“[U]nder Goss students have a right to only minimal process.”); Donovan v. Ritchie, 68 F.3d 14, 17-18 (1st Cir.1995) (applying these requirements to a temporary school suspension that also barred participation in athletics and school activities, yet noting that under Goss, “the mere fact other sanctions are added to a short suspension does not trigger a requirement for a more formal set of procedures”); C.B. ex rel. Breeding v. Driscoll, 82 F.3d 383, 386-87 (11th Cir.1996) (noting that, in the short school-suspension context, “the process provided need consist only of ‘oral or written notice of the charges against [the student] and, if he denies them, an explanation of the evidence the authorities have and an opportunity [for the student] to present his side of the story’ ”) (quoting Goss, 419 U.S. at 582, 95 S.Ct. 729); Signet Constr. Corp. v. Borg, 775 F.2d 486, 490 (2d Cir.1985) (citing Goss for the proposition that “[situations may occur where, given the burden a normal proceeding would impose, the nature of the interests at stake, the time limit for state action, and other circumstances, an informal nonjudicial hearing will suffice”).
Measured by these requirements, each plaintiffs claim fails as a matter of law— first because neither boy was in fact suspended and second because, with respect to Zach, even if he had been suspended, the process given him was all the process that was due. We consider each claim in turn.
1. Rhys Williams
In the district court’s view, Rhys Williams and his parents could not challenge the validity of the procedures used to impose a suspension on Rhys because the school never suspended him. We agree.
Rhys and his parents claim that he “was kept out of school for a period of several days” following his court appearance. Williams Br. at 24. And they observe that Vice-Principal Howell wrote a memo on April 23, 1999 indicating that “suspension papers for Zach and Rhys” had been prepared. Id. at 42. At the same time, however, they concede that “it appears that the suspension was never signed or filed.” Id. at 24. And, most pertinently, Rhys’s mother acknowledged in her deposition that Rhys in fact was not suspended.
Q. He was allowed to go to school that entire week, correct? He was not under suspension? From April 26 on, he was not under suspension, was he?
A. No, he was not under suspension.
*640 Q. So he just chose not to go to school that week?
A. I guess a lot of us chose that he did not go that week.
Q. How come?
A. I called the principal and asked about the work he’s going to miss and whether to—I told her I was going to leave him out of school for a few days, this and that, and she said she’s not telling him not to come to school, but she would advise or suggest it would be a good thing that he didn’t for the safety.
JA at 437 (Allen Dep.).
On this record, the district court correctly rejected this due process claim as a matter of law. Rhys’s mother acknowledged that her son was not suspended by the school district and that the decision to keep him home was hers, not the principal’s. Even if this decision came with the principal’s support, that fact does not lay the necessary predicate for this claim— that the school district in fact imposed a suspension.
2. Zach Durbin
The district court likewise rejected Zach Durbin’s due process claim on the ground that the school merely initiated a formal suspension procedure against Zach but never followed through on it. We again agree, and add that, even if Zach did receive an informal suspension, he received all of the process to which Goss entitles him.
According to Zach’s mother (Bobbi La-Cross), on Monday, April 26th, Howell told her “Zach was going to be suspended; but if he was found not guilty [of the aggravated menacing charge], then the suspension would be canceled.” JA at 617 (LaCross Dep.). LaCross interpreted this statement to mean that the school had imposed a ten-day suspension on Zach, which was “to be served immediately.” Durbin Br. at 15. There is little doubt that at this point suspension papers were prepared, Howell asked Zach to sign them, and it is fair to infer from the record that Howell at least expected that a formal suspension would be issued.
At some point after this initial conversation between Howell and LaCross, she asked Superintendent Lodge for the suspension paperwork so that she could file an appeal of the suspension, as authorized by Ohio law. See Ohio Rev.Code Ann. § 3313.66(D)-(E). Consistent with Howell’s previous statement to LaCross regarding the status of Zach’s suspension, Lodge told her “there’s nothing to appeal at this point in time.” JA at 638 (Lodge Dep.).
The school eventually gave LaCross the prepared suspension papers—though well after Zach had already returned to school and not because the school actually followed through on the suspension, but because LaCross asked to see the proposed papers. Because Zach was found not guilty of the criminal charge of aggravated menacing in September 1999, no suspension was ever issued (and none appears on his record), no formal papers were served on Zach and his family, and no formal suspension procedures were followed.
While the school district’s suspension policy stipulates that adequate notice and an opportunity for an informal hearing be given to a student before a suspension is issued, see Ohio Rev.Code Ann. § 3313.66(A), it nowhere stipulates when and how school administrators are to suspend students. Nor does it prohibit conditioning a suspension on whether a student is criminally convicted of a charge. See generally Ohio Rev.Code Ann. § 3313.66. Had Zach been found guilty of aggravated menacing, there is no reason to believe his *641 “Notice of Suspension” would not have crossed Lodge’s desk, setting the official school-district suspension process on its proper course. On this record, we agree with the district court that the school never issued the suspension, even if it did initiate the suspension process, and accordingly this due-process claim should be dismissed.
But even if one assumes that the record creates a fact dispute about whether Zach received an informal suspension, his procedural due-process rights were not violated. “[I]n connection with a suspension of ten days or less,” Goss requires only “that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence that authorities have and an opportunity to present his side of the story.” 419 U.S. at 581, 95 S.Ct. 729. The decision also provides that “[t]here need be no delay between the time ‘notice’ is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred.” Id. at 582, 95 S.Ct. 729. Here, after taking written statements from the three girls, Howell called Zach to his office for questioning. He informed Zach of the allegations against him and asked Zach for an explanation. No doubt, there was little delay, if any, between the notice Zach received and his chance to respond, but under Goss that was all that was required. See 419 U.S. at 582, 95 S.Ct. 729; Kaelin v. Grubbs, 682 F.2d 595, 602 n. 9 (6th Cir.1982).
Nor was there a violation of Zach’s right to a hearing. Again, Goss points the way. It explains that the student must “be[ ] given an opportunity to explain his version of the facts at this discussion,” and the student should “be told what he is accused of doing and what the basis of the accusation is.” 419 U.S. at 582, 95 S.Ct. 729. As this Court has observed, “ ‘informal give- and-take between student and disciplinarian’ will satisfy the procedural due process requirements for a suspension lasting for ten days or less.” Buchanan v. City of Bolivar, 99 F.3d 1352, 1359 (6th Cir.1996) (quoting Goss, 419 U.S. at 584, 95 S.Ct. 729). Once Howell informed him of the allegations, Zach was given a chance to respond. He explained the nature of his conversation with Rhys and Gail Allen on April 23rd, admitted that Rhys (in Zach’s presence) had been “joking around” about Columbine, and admitted that he knew about Kayla’s note. After this conversation, Zach may well have believed that the information before Howell did not suffice to suspect him of trying to bomb the school or shoot its students. But he cannot claim that he was denied the kind of “informal give-and-take between student and disciplinarian” that Goss requires for a ten-day suspension from school. Goss, 419 U.S. at 584, 95 S.Ct. 729.
Zach’s argument that his due-process rights were violated because he did not receive written notice, see Ohio Rev.Code Ann. § 3313.66(A)(1), and LaCross’s argument that she did not receive written notice within one day of the supposed suspension, see Ohio Rev.Code Ann. § 3313.66(D), are unavailing. While they may be relevant state-law claims, they do not affect our interpretation of the Fourteenth Amendment because the liberty interest to which Zach’s due-process rights attach is his interest in his continued education, not his interest in written notice. See Martin, 295 F.3d at 706 (noting that in the context of a school suspension that allegedly did not conform to provisions of state law, “failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process” and that Goss has established the minimal due pro *642 cess required in the context of a short-term suspension); Purisch v. Tenn. Tech. Univ., 76 F.3d 1414, 1423 (6th Cir.1996) (noting that in the context of an allegedly unfair tenure review, “[violation of a state’s formal procedure [ ] does not in and of itself implicate constitutional due process concerns.... [T]he issue ... is not whether [school administrators] conformed [with the school’s] ... grievance procedure in reviewing the tenure decision. Rather, the issue is whether Purisch was afforded the process due to protect his property right to a fair tenure review process”); Pro-Eco, Inc. v. Bd. of Comm’rs, 57 F.3d 505, 514 (7th Cir.1995) (“Section 1983 affords relief only if the Constitution is offended, and a violation of a state procedural statute does not offend it.”).
In the end, Goss establishes the minimal procedural requirements necessary to protect a student in the context of a short-term school suspension. The notice Howell gave Zach was satisfactory under Goss because Howell, as the relevant disciplinarian, discussed the alleged misconduct with Zach, who was given a chance to respond. Though expeditious and assuredly informal in nature, Zach received the rudimentary process required by Goss when the suspension is ten days or less. Suspended or not, in other words, Zach’s Fourteenth Amendment due-process rights were not violated.
C. State Law Claims
Rhys and Zach also appeal their state law claims. Rhys appeals his false arrest and false imprisonment claims, saying simply that they “rise or fall entirely on the issue of probable cause. For that reason, the facts and analysis ... regarding [his] ... Fourth Amendment claims apply equally to these claims under Ohio law.” Williams Br. at 43.
As to the false arrest claim, Hayes and Stevens, as employees of a political subdivision performing a governmental function, are immune from tort liability unless Rhys can show their “(a) ... acts or omissions were manifestly outside the scope of the employee’s employment or official responsibilities; (b) [their] acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]-(c) [c]ivil liability is expressly imposed upon [them] by a section of the Revised Code.” Ohio Rev.Code Ann. § 2744.03(A)(6)(a)(c). Rhys has not provided any evidence that these defendants acted with malice, bad faith or in a wanton or reckless manner. And because we have already concluded that Hayes and Stevens had probable cause to arrest and detain Rhys and Zach, the probation officers’ actions were within the scope of their employment and in good faith.
As to the false imprisonment claim, Rhys must show Hayes and Stevens confined him intentionally without lawful privilege and against his consent in a limited area for a non-trivial period of time. See Feliciano v. Kreiger, 50 Ohio St.2d 69, 362 N.E.2d 646, 647 (1977); see also Witcher v. City of Fairlawn, 113 Ohio App.3d 214, 680 N.E.2d 713, 715 (Ct.App.1996). The detention must be “purely a matter between private parties for a private end” in which there is no intention of bringing an individual before a court. Rogers v. Barbera, 170 Ohio St. 241, 164 N.E.2d 162, 164 (1960). Hayes and Stevens did not falsely imprison Rhys because they confined him in accordance with Ohio law.
 Zach also appeals his malicious prosecution claim. To prevail, he must establish “(1) malice in instituting or continuing the prosecution, (2) lack of probable cause and (3) termination of the prosecution in favor of the accused.” Trussell v. Gen. Motors Corp., 53 Ohio St.3d 142, 559 *643 N.E.2d 732, 735 (1990). Officer Harbin is the only defendant who instituted a prosecution in this case — charging Zach with aggravated menacing, which requires proof that one knowingly caused another to believe the offender would cause serious harm. Ohio Rev.Code Ann. § 2903.21. Zach acknowledges that Harbin’s complaint against him “included these elements and further alleged that Zachary threatened the life of Sadie LePage, as well as the lives of other students, with a gun or a bomb.” Durbin & LaCross Br. at 28. Though the prosecution ultimately terminated in Zach’s favor, Zach has failed to allege any facts that demonstrate Harbin acted with malice toward him in commencing this prosecution.
III.
For the foregoing reasons, the district court’s decision is affirmed.