NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0611n.06
Filed: July 20, 2005

No. 04-5868

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JAY HOWARD ROTHHAUPT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHARLIE MAIDEN, JR., Individually and in | ) | EASTERN DISTRICT OF KENTUCKY |
| his official capacity as Carroll County Sheriff; | ) | |
| RON WAYNE DICKOW, Individually and | ) | |
| Deputy Carroll County Sheriff; SELDON | ) | |
| SCOTT, Individually and in his official | ) | |
| capacity as Special Deputy, Director of Public | ) | |
| Safety; PHYLLIS SCOTT, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: RYAN, MOORE, and COOK, Circuit Judges.

COOK, Circuit Judge. Jay Rothhaupt appeals the district court's grant of summary judgment for Defendants-Appellees on his federal and state-law claims arising out of his arrest by Defendant-Appellee Ron Dickow. Upon review, we reverse the district court's grant of qualified immunity to Dickow with respect to the arrest, but affirm its judgment in all other respects.

I. Background

This case begins with a sale through the auction website Ebay. Rothhaupt, who lives in Colorado, purchased four Pfaltzgraff Heritage tumblers on Ebay from Kentucky residents Seldon and Phyllis Scott for $59.00. Upon receiving the tumblers, Rothhaupt noticed flaws not mentioned in their Ebay description. He complained to the Scotts via e-mail, and both sides exchanged e-mails over several days to resolve the dispute. Rothhaupt remained unsatisfied, however, even after the Scotts offered a full refund plus return shipping costs.

Mr. Scott told Rothhaupt he felt harassed by the tone of Rothhaupt's e-mails, and suggested Rothhaupt call him to resolve the dispute. But Rothhaupt did not call. Instead, he continued sending e-mails, stating, for example: "Clearly there are additional things you can do to resolve the problem you've caused via your fraud, so your claim that you 'have done all that is possible' is false. Perhaps you're confusing the set of things you're *willing* to do with the set of things you *can* do." Rothhaupt also stated that he intended to file fraud reports with Ebay and the United States Postal Service.

Scott, who served as a special deputy with the Carroll County, Kentucky, Sheriff's Department, shared some details of this dispute with his co-workers, including Deputy Ron Dickow. He also contacted other Ebay sellers who reported similar experiences with Rothhaupt.

In September 2001, Rothhaupt drove from Colorado to Pennsylvania to visit his mother. He brought with him a rifle to practice target shooting at his mother's house, in preparation for an elk

hunt later that year. He also brought the tumblers, thinking he might hand-deliver them to the Scotts in Kentucky if time permitted.

On September 21, 2001, Rothhaupt called the Scotts' house, and Mrs. Scott answered. Rothhaupt did not identify himself, but told her he had a delivery and wanted to make sure someone would be there to receive it. Mrs. Scott asked where the package was from, and Rothhaupt told her it was from Colorado. She then asked Rothhaupt to wait, and said her husband would talk to him. But Rothhaupt hung up because he had the information he wanted: the Rothhaupts were home.

A few minutes later, Rothhaupt arrived at the Scotts' house and approached the door, carrying an open box and a clipboard with the printed-out e-mail exchanges. He told Mr. Scott the package was "an Ebay return from Jay Rothhaupt in Colorado Springs, [and] the COD is $100.00." Mr. Scott asked Rothhaupt who he was with. After some confusion about what that question meant, Rothhaupt asked, "Do you want to know my identity?" After Scott said yes, Rothhaupt declared, "I'm Jay Rothhaupt."

Scott then turned to his wife and told her to phone the police. The parties dispute what happened next. Rothhaupt claims Scott stated, "I'm a law enforcement officer, stay there." Rothhaupt claims he then asked if Scott was refusing the shipment, and after Scott said yes, he returned to his car. Scott, however, alleges that after Rothhaupt gave his name, Scott repeatedly ordered him to leave the property, and Rothhaupt did so within about one minute, after several requests.

As Rothhaupt drove away from the Scotts' house, Mr. Scott began following him in his car. Soon Dickow, responding to Mrs. Scott's police call, stopped Rothhaupt's car on Interstate 71. Scott, still following Rothhaupt, pulled over behind the other two cars. Dickow spoke to Scott before speaking with Rothhaupt. Scott told Dickow that Rothhaupt had called the house without identifying himself to find out if anyone was home, arrived at the Scotts' house uninvited, and then refused to leave when ordered to do so.

Dickow then approached Rothhaupt's car and asked Rothhaupt if he had been to the Scotts' house. Rothhaupt admitted he had, but claimed he had written permission to be there. Dickow asked to see the tumblers, which were in the back of the car, but Rothhaupt denied Dickow permission to enter the car. Dickow ordered Rothhaupt out of the car and frisked him, finding no weapons. Dickow then asked Rothhaupt if he had ever been arrested or if he had any illegal drugs or firearms in the vehicle. Rothhaupt denied having been arrested or possessing drugs, but said he had a rifle in the footwell of the back seat. He explained that he had the rifle because he was coming from Pennsylvania, where he had used it for target practice.

Dickow walked back to the police car and conferred with Scott again. Scott repeated his claim that Rothhaupt had refused to leave the Scotts' property when ordered to do so. Dickow then walked back to Rothhaupt and placed him under arrest, handcuffing him and putting him in the back of the police car. Dickow then searched Rothhaupt's car, where he found the rifle, among other things. Scott and another deputy who arrived, Medford, also helped search. According to Rothhaupt,

Scott told Medford, "This is the guy I told you about at the station who's been doing this stuff to Ebayers and threatened me with fraud."

Dickow eventually charged Rothhaupt with second-degree stalking, harassing communications, theft by deception, and third-degree criminal trespass. While Rothhaupt was held in the county jail and his car was impounded, Dickow applied for and obtained a search warrant. Searching the car again, he found several medications in a black film container, including caffeine tablets, aspirin, and 800 milligrams of ibuprofen, which he believed were prescription medication. Rothhaupt posted bond and was released from the detention center the next day. Having found the ibuprofen during the search, Dickow arrested Rothhaupt again as he left the detention center for possessing prescription medication not in its original container. Rothhaupt was released shortly thereafter without posting additional bond.

The prescription-drug and theft-by-deception charges were eventually dropped, but Rothhaupt was tried on the other three charges. The trial judge dismissed the stalking charge at the close of the prosecution's case-in-chief, and the jury acquitted Rothhaupt on the other two charges.

Rothhaupt then brought this suit under 42 U.S.C. § 1983 in the district court against Sheriff Charlie Maiden, Dickow, and the Scotts, alleging violations of his constitutional rights and various pendent state-law claims. After a brief discovery period, the district court granted summary judgment for all defendants. It dismissed the claims against Phyllis Scott because she did not act under color of state law. It dismissed the claim against Maiden in his individual capacity because he was not

personally involved in the incident. It dismissed the claims against defendants in their official capacities, because Rothhaupt had not demonstrated they were acting pursuant to a municipal custom or exhibited deliberate indifference to his constitutional rights. It held that Scott and Dickow had not violated Rothhaupt's constitutional rights—and were therefore entitled to qualified immunity—because they had reasonable suspicion to stop him and probable cause to arrest him, and the search of his car was incident to the arrest. Finally, after dismissing the federal claims, the court discontinued supplemental jurisdiction over the pendent state-law claims.

We review the district court's grant of summary judgment under the familiar *de novo* standard. *Boone v. Spurgess*, 385 F.3d 923, 927 (6th Cir. 2004). And in determining whether the defendants enjoy qualified immunity, we consider: (1) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (2) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (3) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal citations and quotation marks omitted).

## II. The Stop

We agree with the district court that Dickow and Scott are immune with respect to the initial stop, because it was constitutional. "[W]here a law enforcement officer lacks probable cause, but

possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

Here, a dispatcher told Dickow that Mrs. Scott had reported a suspicious person who refused to leave her property. Dickow knew the car he pulled over belonged to that suspicious person. Thus it was reasonable for Dickow to stop Rothhaupt. Rothhaupt argues that the stop was unjustified because his alleged crimes did not occur in Dickow's presence. But the Constitution imposes no such requirement. *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (Kentucky's requirement that an officer personally witness a misdemeanor before making an arrest does not affect Fourth Amendment analysis).

### III. The Arrest

We disagree with the district court on the propriety of the arrest, because Dickow lacked probable cause. Under the Fourth Amendment, an officer "may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime." *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004). Probable cause depends on "whether at that moment [of arrest,] the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v.*

*Ohio*, 379 U.S. 89, 91 (1964). This is typically a jury question, unless only one reasonable determination is possible. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005).

"[A] mere allegation [of criminal behavior], while possibly justifying a brief investigatory detention, is insufficient by itself to establish probable cause that a crime had been committed." *Id.* at 305. To establish probable cause in the face of such a naked allegation, an officer must investigate further and find objective factors to corroborate the claim. *See id.* at 308-09.

Here, at the moment of arrest, Dickow was faced with conflicting statements from Scott and Rothhaupt regarding whether Rothhaupt had permission to be on the Scotts' property—and he impermissibly relied on Scott's assertions without any further investigation. True, he knew Scott from the sheriff's department and had heard him complain about an Ebay customer who "annoyed" him. But this did not suffice to elevate his reasonable suspicion to probable cause—especially in light of Scott's personal interest in the matter, both because Scott was the alleged trespass victim and because of Scott's ongoing dispute with Rothhaupt. *See id.* at 309 (claims of "an interested party involved in a contentious dispute . . . should be viewed in a skeptical light"). And, importantly, Dickow failed to properly investigate the matter by not even asking to see the written permission Rothhaupt claimed to have.[1] Nor, apparently, did he ask Rothhaupt for a detailed description of the

---

[1]Judge Ryan argues in dissent that "[n]o reasonable trier of fact could conclude . . . that Rothhaupt had written permission to come onto the Scotts' property." The focus, however, is on whether Dickow possessed reliable reasons for finding probable cause at the time of Rothhaupt's arrest. Dickow acted on Scott's information without evaluating Rothhaupt's "written permission" claim. We agree that if he had asked and investigated the matter further, he might have established probable cause. But the record lacks that requisite investigation.

events on the Scotts' property. Rothhaupt left the Scotts' property within minutes of being asked, even according to Scott

Considering all this in the light most favorable to Rothhaupt, as we must, we cannot say the evidence compels a conclusion that probable cause supported Rothhaupt's arrest for trespass, stalking, harassing communications, or theft by deception.[2] Thus, a reasonable jury could find that Dickow violated Rothhaupt's Fourth Amendment right, and we must next consider in assessing Dickow's qualified immunity entitlement, whether the right was clearly established, and whether Dickow's actions were objectively unreasonable in light of that right. *Feathers*, 319 F.3d at 848.

Without question, it was clearly established at the time of Rothhaupt's arrest that an arrest without probable cause was unconstitutional. *See Radvansky*, 395 F.3d at 310. In light of that right, and considering all facts in the light most favorable to Rothhaupt, Dickow's actions—making an arrest for a misdemeanor trespass and other non-violent offenses, based solely upon an interested

---

[2]Judge Ryan argues Dickow had probable cause to arrest for stalking and harassing communications. We find probable cause even weaker for these two offenses. Dickow does not even argue on appeal that he had probable cause to arrest for stalking—presumably because the record reveals no allegation that Rothhaupt explicitly or implicitly threatened sexual contact, physical injury, or death, as Kentucky's stalking statute requires. *See* Ky. Rev. Stat. Ann. § 508.150(1).

As for "harassing communications," these must serve "no purpose of legitimate communication." Ky. Rev. Stat. Ann. § 525.080(1). But here Dickow knew Rothhaupt's communications pertained to both his Ebay dispute and to determining whether the Rothhaupts were home so he could make a delivery—surely matters of "legitimate communication." It also appears that Dickow's knowledge of these communications, like his knowledge of the trespass, may have come entirely from Mr. Scott. (Dickow claims to have asked Rothhaupt about the phone call, but cannot recall Rothhaupt's response, and Rothhaupt's account of their encounter does not include any discussion of the phone call.)

party's allegations—were unreasonable. *See id.* We therefore reverse the district court's grant of qualified immunity for Dickow and remand the Fourth Amendment claim regarding Rothhaupt's arrest.

## IV. The Search

The district court dismissed Rothhaupt's claim arising out of the search of his car after his arrest. We affirm because the search did not violate a clearly established constitutional right.

During an investigative stop, a police officer may search an automobile's passenger compartment, "limited to those areas in which a weapon may be placed or hidden," so long as he reasonably believes "the suspect is dangerous and . . . may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Here, Rothhaupt admitted to having a rifle in his car's passenger compartment. So although Dickow might have lacked probable cause to arrest Rothhaupt, he nonetheless could have searched the car for weapons as part of the *Terry* stop. Rothhaupt thus fails to allege a constitutional-rights violation, and we therefore affirm the district court's grant of qualified immunity with respect to the search.

## V. Individual-Capacity Claims

We affirm the district court's dismissal of the claims against Mr. Scott and Sheriff Maiden in their individual capacities. An officer who did not participate in an arrest cannot be held liable for constitutional violations arising out of that arrest. *Radvansky*, 395 F.3d at 311. Here, Scott did not participate in Rothhaupt's arrest—he merely complained to Dickow, who made the arrest. And we

have no evidence that Sheriff Maiden played any role in these events, either directly or indirectly by instructing Dickow.

## VI. Official-Capacity Claims

We likewise affirm the district court's dismissal of the claims against Appellees in their official capacities. "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal quotation marks omitted). An official-capacity claim "is *not* a [claim] against the official personally, for the real party in interest is the entity." *Id.* at 166. To establish liability in such a claim, the plaintiff must demonstrate that "the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law." *Id.* (internal citations and quotation marks omitted).

In support of his official-capacity claim, Rothhaupt argues that his alleged rights violations resulted from Carroll County's failure to train its police officers. To succeed on this failure-to-train claim, Rothhaupt "must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). Rothhaupt fails to provide any such evidence—and the claim therefore fails.

## VII. Due Process

Finally, we affirm the district court's dismissal of Rothhaupt's due-process claims.

Rothhaupt argues the Appellees deprived him of property without due process by keeping "extensive amounts" of his property seized during the search of his vehicle, including "hundreds of documents" and "several heirlooms." None of these items, however, is listed on the inventory of objects seized during the vehicle search. And while their absence from the list does not prove that police did not seize them, Rothhaupt offers no evidence that the items were ever actually in the vehicle.

The claim also fails because Rothhaupt does not show that existing state remedies are inadequate. "If satisfactory state procedures are provided in a procedural due process case, then no constitutional deprivation has occurred despite the injury." *Jefferson v. Jefferson County Pub. Sch. Sys.*, 360 F.3d 583, 587-88 (6th Cir. 2004); *see also Mitchell v. Fankhauser*, 375 F.3d 477, 481-84 (6th Cir. 2004) (plaintiff must plead inadequacy of state remedies where alleged due-process violation involved "a random or unauthorized act"). That is, Rothhaupt cannot claim a denial of due process without explaining why the existing process is inadequate—he "must prove the inadequacy of state remedies as an element of [his] constitutional tort." *Jefferson*, 360 F.3d at 588. Here, Rothhaupt fails to explain why a state tort remedy for conversion would not suffice to address his claim. *See Fox v. Van Oosterum*, 176 F.3d 342, 349 (6th Cir. 1999). The federal claim therefore fails.

## VIII. Conclusion

No. 04-5868
*Rothhaupt v. Maiden*

For the foregoing reasons, we reverse the district court's grant of qualified immunity for

Dickow on Rothhaupt's unlawful-arrest claim, and remand that claim to the district court for further

proceedings. We affirm, however, dismissal of all the other claims.

RYAN, Circuit Judge, dissenting.          My colleagues conclude that the district court's grant of summary judgment should be reversed because Dickow did not have probable cause to arrest Rothhaupt for the crimes with which he was charged. Because I believe Dickow had probable cause to arrest Rothhaupt, I respectfully dissent.

My colleagues reason that, given the conflicting statements as to whether Rothhaupt had permission to remain on the Scotts' property, Dickow impermissibly relied on Seldon Scott's statement alone without any further investigation, and thus did not have probable cause to arrest Rothhaupt on any grounds. During the traffic stop, Scott informed Dickow that he had "told [Rothhaupt] to leave," to which Rothhaupt responded: "No, you didn't, you said to stay." Rothhaupt also told Dickow that he had written permission to be on the Scotts' property, but there is no genuine issue of material fact as to whether Rothhaupt had such permission. At the time of his arrest, Rothhaupt had in his possession a printout of the e-mail exchanges between himself and Scott concerning the eBay sale of the tumblers. Apparently, Rothhaupt interpreted Scott's offer "to pay return shipping" as an invitation to Rothhaupt to travel from Colorado to the Scotts' home in Kentucky to personally hand deliver the tumblers and demand cash on delivery. No reasonable trier of fact could conclude from this language or anything else in the record that Rothhaupt had written permission to come onto the Scotts' property, nor would it have undermined Scott's allegation of criminal trespass had Dickow read this document.

Given the evidence above, it is apparent that the facts are in dispute as to whether Scott ordered Rothhaupt to leave his property. Those conflicting statements, however, have real

significance only for the criminal trespass charge. Dickow testified, and his citation confirms, that he initially arrested Rothhaupt, not only for criminal trespass, but also for harassing communications, stalking in the second degree, and theft by deception. My colleagues do not explain why the dispute as to whether Scott ordered Rothhaupt to leave his property, the resolution of which was necessary to determine whether Rothhaupt had committed a criminal trespass, necessarily eliminated probable cause for the other crimes for which Rothhaupt was arrested and charged. "[W]here no probable cause exists to arrest a plaintiff for a particular crime, but . . . probable cause exists to arrest that plaintiff for a related offense, the plaintiff cannot prevail in a suit alleging wrongful arrest brought pursuant to 42 U.S.C. § 1983." Voyticky v. Village of Timberlake, ---F.3d---, 2005 WL 1500900, at *4 (6th Cir. Jun. 22, 2005). Indeed, none of the other charged crimes require evidence that an arrestee remained unlawfully on another's property.

Even assuming Dickow did not have probable cause to arrest Rothhaupt for criminal trespass, there is sufficient evidence from which a reasonable officer could conclude that there was probable cause to arrest Rothhaupt for stalking in the second degree. Under Kentucky law, stalking is "an intentional course of conduct . . . [d]irected at a specific person or persons . . . [w]hich seriously alarms, annoys, intimidates, or harasses the person or persons[,] and [w]hich serves no legitimate purpose." Kentucky Rev. Stat. Ann. § 508.130(1)(a). "A person is guilty of stalking in the second degree when he intentionally . . . [s]talks another person[] and [m]akes an explicit or implicit threat with the intent to place that person in reasonable fear of . . . [s]exual contact . . . [,] . . . [p]hysical injury[,] or [d]eath." Kentucky Rev. Stat. Ann. § 508.150(1).

In his citation, Dickow briefly explained why he arrested Rothhaupt for stalking in the second degree: "Subject drove from Colorado to Kentucky to deliver [a] package, would not [identify] self or contents in package." Dickow also testified regarding his reasons for arresting Rothhaupt for stalking in the second degree:

> I was notified by Seldon Scott, deputy, prior to Mr. Rothhaupt's arrest -- approximately six weeks -- stating that he was involved with a transaction through eBay with Mr. Rothhaupt.

> He had come to me and was concerned about what was going on. It did raise his level of safety -- that he had tried to work it out and finally he did state that through speaking and also e-mails that he didn't want no more communication with Mr. Rothhaupt. After that, the traffic stop, him showing up at the door, is what I classified as stalking.

Thus, Dickow was aware of the bizarre e-mail exchange arising from the eBay sale in which Scott ordered Rothhaupt to "quit harassing us." He knew that the Scotts were concerned for their "safety." Scott told Dickow at work that he was "alarmed" and "annoyed" by Rothhaupt's behavior. Dickow believed that Rothhaupt's uninvited and unanticipated presence at the Scotts' home in Kentucky, hundreds of miles away from Rothhaupt's home in Colorado, was strange, stalking-like behavior. Dickow knew that, upon arriving at the Scotts' home, Rothhaupt refused to identify himself or the contents of the package until he was asked several times to do so by Scott. At the traffic stop, Dickow learned from Scott that Rothhaupt had harassed other eBay users. A reasonable officer could legitimately infer from these facts that Rothhaupt's conduct was actually motivated by an intent to alarm and intimidate the Scotts, notwithstanding any legitimate purpose Rothhaupt claimed to have for his actions.

Dickow also had probable cause to arrest Rothhaupt for harassing communications. "A person is guilty of harassing communications when with intent to harass, annoy or alarm another person he . . . [c]ommunicates with a person . . . by telephone, telegraph, mail or any other form of written communication in a manner which causes annoyance or alarm and serves no purpose of legitimate communication[.]" Kentucky Rev. Stat. Ann. § 525.080(1)(a). In his citation, Dickow noted that the "subject telephoned deputy would not [identify] self, then hung up on him, [and a] few minutes later shows up [at] residence." Dickow testified that, prior to the arrest, Scott informed him of the details underlying the harassing communications charge: "Basically, he explained to me that . . . one of them received a phone call approximately five minutes prior to this Mr. Rothhaupt showing up at his residence. The phone call was made. The gentleman wouldn't identify hisself [sic]. It alarmed . . . Phyllis [Scott]. She was concerned about it." Rothhaupt's phone call was sufficiently alarming that, after he hung up on her, Phyllis Scott went around the house locking all the doors.

To support their conclusion that Dickow lacked probable cause to arrest Rothhaupt, my colleagues rely primarily on the case of Radvansky v. City of Olmsted Falls, 395 F.3d 291 (6th Cir. 2005). In Radvansky, the plaintiff was arrested by the defendant police officers for burglary after the plaintiff broke into his own leased residence. Id. at 299-301. Because the plaintiff had paid most of his rent for the month, the court noted that the plaintiff was a current tenant, with a right to enter and occupy the residence, and thus could not be found liable for burglary. Id. at 304. The court rejected the argument that the defendant police officers had probable cause to arrest the plaintiff for a number of related but uncharged crimes, including breaking and entering, criminal trespass, and criminal

mischief. Id. at 307 n.12. The court explained that, like the charged crime of burglary, the other crimes all required a showing of either criminal trespass or unprivileged activity. Id. The court thus concluded that, because "the police should have known [the plaintiff] was a current tenant entitled to 'custody and control' of the . . . residence, whether there was probable cause to arrest [the plaintiff] for any of these other crimes is a disputed material fact as well." Id.

No similar conclusion can be reached here. While the facts may be in dispute as to whether Rothhaupt "remain[ed] unlawfully in or upon premises," Kentucky Rev. Stat. Ann. § 511.080(1), and thus whether Dickow had probable cause to arrest Rothhaupt for criminal trespass, the other crimes for which Rothhaupt was arrested—harassing communications, stalking in the second degree, and theft by deception—do not require evidence of a trespass to establish probable cause. It is of no significance that Rothhaupt was never convicted for any of the above offenses because "[t]he existence of probable cause to arrest . . . does not depend on actual criminal liability[.]" Radvansky, 395 F.3d at 304. Rather, whether Rothhaupt's arrest was constitutionally valid depends upon "whether, at the moment the arrest was made, . . . the facts and circumstances within [Dickow's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [Rothhaupt] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964).

Because I believe Dickow had probable cause to arrest Rothhaupt, at the very least, for harassing communications and stalking in the second degree, I respectfully dissent.