*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0024p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

GEOFFREY M. RADVANSKY,

*Plaintiff-Appellant,*

v.

No. 03-3798

CITY OF OLMSTED FALLS et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 02-00634—John R. Adams, District Judge.

Argued: August 11, 2004

Decided and Filed: January 14, 2005

Before: SILER, MOORE, and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** L. Bryan Carr, L. BRYAN CARR COMPANY, Mayfield Heights, Ohio, for Appellant. John T. McLandrich, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, for Appellees. **ON BRIEF:** L. Bryan Carr, L. BRYAN CARR COMPANY, Mayfield Heights, Ohio, Leonard F. Carr, LEONARD F. CARR COMPANY, Mayfield Heights, Ohio, for Appellant. John T. McLandrich, Robert F. Cathcart, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, for Appellees.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Geoffrey M. Radvansky ("Radvansky") appeals the district court's grant of summary judgment in favor of Defendants-Appellees, the City of Olmsted Falls ("the City"), Police Chief Jeffrey Rice ("Rice"), Detective Thomas Caine ("Caine"), Officer Ralph Saxer ("Saxer"), and Officer Thomas Telegdy ("Telegdy") (hereinafter "Appellees"). Radvansky was arrested by Telegdy and Saxer after breaking into a house, in which he was renting a room. Despite the officers' pre-existing knowledge that he was currently involved in a dispute with his landlord, his repeated protestations that he lived there, undisputed documentary evidence which supported that claim, and the presence of his personal property, clothing and furnishings within the house, Radvansky was placed under arrest for burglary. Eventually, the county prosecutor entered a *nolle prosequi*, dismissing all the charges against him. Radvansky brought suit under 42 U.S.C. § 1983 alleging a violation of several of his constitutional rights as well as a number of state-law claims. The district court granted the defendants' motion for

1

summary judgment on all of the § 1983 claims, finding that there was probable cause for the arrest. Furthermore, because it concluded there was no constitutional violation, the district court granted the defendants summary judgment on the remaining federal and state-law claims as well. The district court erred, however, both in determining that there was probable cause to arrest Radvansky and that Telegdy and Saxer were entitled to qualified immunity. Therefore, the decision below is **REVERSED** with respect to the Fourth Amendment claim against Telegdy and Saxer but **AFFIRMED** in all other respects on other grounds.

## I. BACKGROUND

The events in this case stem from Radvansky's arrest on May 15, 2001, for burglary of Derrick Rosemark's ("Rosemark") house located at 26060 Redwood Drive (the "Redwood Drive residence") in Olmsted Falls, Ohio. Since June 21, 2000, Radvansky had been living as a tenant at that residence, pursuant to an oral agreement whereby he paid Rosemark $450 in rent each month.[1] Radvansky has stated that his rent was fully paid, with the exception of $60 more that he owed for the month of May 2001.

Around the end of April or beginning of May 2001, Rosemark called the Olmsted Falls Police Department and spoke with Detective Caine. Rosemark informed Caine that Radvansky had been living at Rosemark's residence but left for Florida still owing Rosemark money. Rosemark asked how to recover the money owed to him and expressed concern that Radvansky still had possession of keys to the premises. Despite recognizing that this was a civil dispute between the two parties, Caine, a police detective, gave legal advice to Radvansky that contravened Ohio law. Caine told Rosemark he should contact a lawyer to get his money back but that "You can change the locks if you want." J.A. at 677 (Caine Dep.). Ohio law prohibits a landlord from excluding a tenant from the premises for the purpose of recovering possession of the residence. Ohio Rev. Code Ann. § 5321.15. Caine suggested that if Rosemark did indeed change the locks, he should inform Radvansky not to break into the house.

After spending the weekend at a friend's house, Radvansky returned to the Redwood Drive residence on Sunday, May 13, 2001, and found a note posted on the door from Rosemark, informing

---

[1]Radvansky has claimed throughout the litigation that his tenancy was pursuant to an oral lease agreement. Appellant's Br. at 5; Joint Appendix ("J.A.") at 280 (Pl's Br. Opp. Summ. J.); J.A. at 817 (Pl. Dep.); J.A. at 1014 (Pl's Resp. to Defs' Interrogs.). Under Ohio law, however, a lease agreement must be in writing to be enforceable. Ohio Rev. Code Ann. § 1335.04; *Manifold v. Schuster*, 586 N.E.2d 1142, 1144 (Ohio Ct. App. 1990). Relying on a 1927 Ohio Court of Appeals case, Radvansky has argued that the oral lease is enforceable through the doctrine of part performance, because he paid rent and took possession of the property. J.A. at 293 (Pl's Br. Opp. Summ. J.). More recently, however, Ohio courts have stated that "partial performance will not take a parol agreement out of the Statute of Frauds without a showing of detrimental reliance by the party arguing partial performance, or an unconscionable advantage obtained by the party raising the statute." *Manifold*, 586 N.E.2d at 1144-45. Thus, "[a] party fails to establish partial performance through evidence of possession and payment of rent alone." *Weishaar v. Strimbu*, 601 N.E.2d 587, 592 (Ohio Ct. App. 1991). Therefore, under Ohio law, a valid lease agreement did not exist between Rosemark and Radvansky. The point is somewhat academic however, because a party who takes possession under an invalid lease creates a tenancy at will, which "converts to a periodic tenancy upon payment and acceptance of rent." *Id.*; *Manifold*, 586 N.E.2d at 1145. The frequency of the rental payments determines the period of the tenancy. *Weishaar,* 601 N.E.2d at 593; *Manifold*, 586 N.E.2d at 1145-46. In this case, Radvansky paid rent monthly, which was accepted by Rosemark, thus creating a month-to-month periodic tenancy governed by Ohio landlord-tenant law. *Sherwin v. Cabana Club Apartments*, 433 N.E.2d 932, 936 (Ohio Ct. App. 1980). Under Ohio law, a landlord must give a tenant notice of termination of a periodic tenancy and most importantly, may not resort to self-help measures to remove the tenant from the premises. Ohio Rev. Code Ann. § 5321.17; § 5321.15. "[A] rental agreement between landlord and tenant is a contract; and, whether written or oral, each party has certain contractual rights and obligations established and guaranteed by R.C. Chapter 5321." *Colquett v. Byrd*, 392 N.E.2d 1328, 1330 (Ohio Mun. Ct. 1979); *see also Thomas v. Papadelis*, 476 N.E.2d 726, 728 (Ohio Ct. App. 1984) (concluding that a lease provision inconsistent with R.C. Chapter 5321 is unconscionable); *Laster v. Bowman*, 370 N.E.2d 767, 770 (Ohio Ct. App. 1977) (holding that the "rights, obligations and remedies" encompassed in R.C. Chapter 5321 are implied in all rental agreements between a landlord and tenant).

Radvansky that he was now locked out.[2]  Radvansky stated in his deposition that he proceeded to call Rosemark at his place of employment, but that the latter "would not reason with [him]." J.A. at 831-32 (Radvansky Dep.).  Realizing that he could not enter the house, Radvansky left the premises.

Radvansky returned the following night, Monday, May 14, 2001, only to find that he was still locked out of the premises.  At that point, Radvansky crossed the street, introduced himself to a neighbor, Ken Winland ("Winland"), and informed him of the situation.  Winland stated at his deposition that he recognized Radvansky as one of the two individuals who lived across the street. Radvansky told Winland that Rosemark was using drugs and had locked him out of the house. Radvansky explained that "[he] just wanted to get [his] firearms out of [his] locked bedroom."[3]  J.A. at 838 (Radvansky Dep.).  Winland stated that Radvansky asked him if he had "a butter knife or something I can use to break in across the street?"  J.A. at 1273 (Winland Dep.).  Radvansky claimed that Winland provided him with a folding blade, but he was unable to gain entrance into the house with it.  Radvansky went back to the Winland house and returned the knife.  Radvansky showed Winland the note which Rosemark had written him and then left.  Winland asserted that he never gave Radvansky a knife or any other tool to break into the house, but rather suggested that Radvansky call the police to gain entrance.  Furthermore, after Radvansky left, Winland walked inside his house and told his wife to call the police.  Winland stated that he was present when his wife called 911, and he heard her tell the dispatcher that the guy living across the street was attempting to break in to get his belongings.

The Olmsted Falls Police Department fielded the call from the Winlands and dispatched Officer Telegdy and Sergeant Daniel Gilles ("Gilles").[4]  Both Telegdy and Gilles stated in their depositions that they found it unusual that a burglar would ask a neighbor for a tool to break into a house.  J.A. at 743 (Gilles Dep.), 1167-68 (Telegdy Dep.).  Gilles was aware of the conversation between Rosemark and Caine which took place a few weeks earlier and that he knew there was "a civil problem with Mr. Radvansky, as far as payment." J.A. at 732 (Gilles Dep.).  When responding to the call on the night of May 14, however, Gilles claimed that he did not make the connection between the Caine conversation and the 911 call.  Telegdy and Gilles arrived at the Redwood Drive residence, but Radvansky had already left.  After checking the house, Gilles talked to Winland, who relayed the details of his conversation with Radvansky.  By that point, Rosemark arrived at the residence and spoke with Gilles.  Rosemark informed Gilles that Radvansky used to live at the house but did not any longer.  Telegdy stated that Rosemark informed them that Radvansky had property

---

[2]The full text of the note reads as follows:

> Geoff, I have locked the door for my own security.  I am informing you not [sic] break in. [A]lso there is a matter of partial rent you owe of $100 partial rent.  None of these belongings until this is settler [sic].  Otherwise I am kicking you out of this house.  [D]o not attempt to enter the premises.  You can call me at work to settle this.
> I also informed the [O]lmsted [F]alls police department of you leaving the property and not to enter the house.

J.A. at 1037 (Resp. to Defs' First Req. for Prod. of Docs.).  The note also listed other expenses for which Rosemark held Radvansky responsible, but which are not relevant to the present discussion.

[3]Radvansky owned two guns which he kept in his locked bedroom.  He stated at his deposition that he was worried that someone might break into his bedroom to get the guns and either sell or use them.  J.A. at 840, 855 (Radvansky Dep.).

[4]Sergeant Gilles was not named as a defendant in the lawsuit.

in the house and that there was a dispute between Radvansky and Rosemark about money. After ensuring that the premises were secure, the officers left the scene.[5]

The next night, Tuesday, May 15, 2001, Radvansky again returned to the Redwood Drive residence to collect his possessions. He brought a curtain rod with him in order to lift the block of wood used to secure the back door. After he failed to gain entry with the curtain rod, Radvansky broke both a screen and a window and crawled into the house. Once inside, he retrieved a stun gun he had hidden in the rafters, cleaned up the broken glass, and then went to retrieve his guns from his locked bedroom. When he reached his bedroom, he found that the door knob had been broken off, the contents of the room had been scattered, and the guns were missing.

Meanwhile, Winland had seen Radvansky walking down the street with the curtain rod and once again told his wife to call the police. Officer Telegdy, this time along with Officer Saxer, responded to the call. Saxer stated that at the start of his shift on May 15, he read the incident reports from the prior day and was aware that "Rosemark was the homeowner asking Mr. Radvansky to leave." J.A. at 1100 (Saxer Dep.). The dispatcher informed the police that "the same person from last evening was back." J.A. at 169 (May 15 Police Incident Rep.). On the way over to the Redwood Drive residence, Telegdy informed Saxer that a man had tried to break into the house the night before to recover his possessions. Upon their arrival, the two officers approached the house from opposite directions. Saxer walked to the back of the house and noticed the broken screen and window. He notified Telegdy about the apparent forced entry, and the officers called for additional help.

Radvansky heard the noises outside, saw the squad car, and "figured [he'd] go out through the back door and explain the situation." J.A. at 866 (Radvansky Dep.). As he saw Radvansky exit through a sliding door in the back of the house, Saxer drew his weapon and identified himself as a police officer. Telegdy also had his weapon drawn and pointed at Radvansky. Although Radvansky immediately informed the officers that he lived there, he was told to lie on the ground and was patted down and handcuffed. Radvansky stated that while on the ground, the officers "had their knees on [his] back and [his] arms" but he did not believe they were ever "maliciously attacking" him. J.A. at 868-69 (Radvansky Dep.). Radvansky complied with all of their orders. While patting him down, the officers asked if he had anything in his pockets, to which he responded that he had a stun gun. Radvansky later claimed that he either placed the stun gun down or it fell out of his pocket when he removed his keys to unlock his bedroom door. It was recovered inside the house.

Radvansky stated that while on the ground he told the officers "I live here, my car is registered here, I have furniture here, all my stuff is here, I have stuff in every room of the house here, I have every right to be here." J.A. at 870 (Radvansky Dep.). Telegdy admitted in his deposition that Radvansky told them, "I came here to get my stuff. I live here." J.A. at 1188 (Telegdy Dep.). The incident report filled out by Saxer indicates that Radvansky "stated that he did nothing wrong, that he lived in the house and forgot his keys." J.A. at 169 (May 15 Police Incident Rep.). The officers helped Radvansky out to the patrol car located in the front of the house where Telegdy patted him down for a second time "to try and find some ID." J.A. at 1189 (Telegdy Dep.). Telegdy removed Radvansky's wallet and found his driver's license, which indicated he lived at the Redwood Drive residence. Saxer also ran Radvansky's social security number, and the dispatcher responded with Radvansky's name and the address of the Redwood Drive residence. A police print-out also reflected Radvansky's address as the same Redwood Drive residence. J.A. at 177 (Police Printout). At the car, when asked by Telegdy what he was doing there, Radvansky responded, "Getting my belongings out of the house." J.A. at 1191 (Telegdy Dep.). Radvansky claimed that

---

[5]Telegdy stated in his deposition that when the officers left that night, they were not aware that any guns were involved in the situation. J.A. at 1179-80 (Telegdy Dep.).

he tried to show the officers the note that Rosemark had written which "states that I owe him rent, that makes me a renter, that gives me every right to live here." J.A. at 882-83 (Radvansky Dep.). The officers refused to look at it.

Gilles, who was present with Telegdy the night before, arrived at the scene along with Officer Lane ("Lane"), in response to Saxer's call for additional help. By the time Gilles arrived, Radvansky was already in custody. Gilles and Lane entered the house to check whether anybody else was present. They retrieved the stun gun for evidence but did not conduct any other investigation into whether any of Radvansky's possessions were inside. In his deposition, Saxer stated that after discussing the matter with Gilles, who was the senior officer at the scene, and determining that Radvansky was unlawfully there, Saxer placed Radvansky under arrest for burglary. Saxer further claimed that during their discussion Gilles never asked him about the relationship between Radvansky and Rosemark, whether Radvansky lived in the house, or if Radvansky paid rent. Gilles claimed that he was not even aware that Radvansky's address was the same as the Redwood Drive residence. Prior to arresting Radvansky, Gilles made a phone call to the Olmsted Falls City Prosecutor, Brad Burland ("Burland"). Gilles informed Burland that Radvansky had forcibly entered Rosemark's home, "that there was a problem between the homeowner and him," that "Radvansky hadn't been there for a period of time, and that he was taken into custody for burglary." J.A. at 767 (Gilles Dep.). Burland responded that they had a strong charge of burglary against Radvansky. Burland later emphasized at his deposition that he would have liked to have known more information about whether there was a lease, what the nature of the relationship was between Rosemark and Radvansky, or even whether rent was paid. He stated that "the Sergeant led me to believe that whatever relationship existed between the homeowner and [Radvansky] had ended quite sometime ago." J.A. at 591-92 (Burland Dep.)

Because Radvansky's hand was bleeding from a cut caused by the broken bedroom door knob, an ambulance was called and he was taken to the hospital for treatment, accompanied by Telegdy. During the ambulance ride, Radvansky reiterated his claims that he lived at the residence and had a right to be there. After Radvansky was finished at the hospital, he was booked at the Olmsted City Police Department and transported to the North Royalton Jail. A criminal charge of burglary was brought before a Cuyahoga County grand jury, and Radvansky was indicted for burglary. The charges were later dropped, however, after Radvansky entered into an agreement with the prosecutor to pay Rosemark $400 in restitution.

On April 4, 2002, Radvansky filed a complaint in United States District Court for the Northern District of Ohio against the City, the Olmsted Falls Police Department, Rice, Caine, Saxer, Telegdy, and Rosemark. The complaint alleged numerous violations of 42 U.S.C. § 1983,[6] conspiracy to deprive Radvansky of his right to equal protection in violation of 42 U.S.C. §§ 1985 and 1986, and various state-law claims.[7] On May 16, 2002, Radvansky filed a motion for default judgment against Rosemark for his failure to answer the complaint, which was granted on August 21, 2002.[8] On June 28, 2002, the district court granted Olmsted Falls Police Department's motion for summary judgment on the ground that it was not *sui juris*. The remaining defendants

---

[6]Specifically, Radvansky alleged § 1983 claims on the basis of the deprivation of: (1) equal protection; (2) due process, (3) the right to be free from unreasonable search and seizure; (4) the right to protect one's property; and (5) the right to liberty, health, safety, privacy, and welfare. J.A. at 21-24 (Complaint).

[7]These included false imprisonment, false arrest, intentional infliction of emotional distress, negligent infliction of emotional distress, malicious criminal prosecution, assault and battery, negligence, and replevin. J.A. at 26-31 (Complaint). The replevin claim was brought only against Rosemark.

[8]Rosemark is not involved in this appeal.

subsequently moved for summary judgment, which was granted by the district court on May 12, 2003. Radvansky filed a timely notice of appeal.

## II. ANALYSIS

### A. Standard of Review

We review a grant of summary judgment de novo. *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). "In deciding upon a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). Finally, "[b]ecause the doctrine of qualified immunity is a legal issue, its application by the district court is reviewed de novo." *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999).

In finding that the defendants were entitled to summary judgment on all counts, the district court conflated the five distinct claims brought under 42 U.S.C. § 1983 and reached its conclusion based on the finding that Radvansky's arrest by Telegdy and Saxer was supported by probable cause and therefore not a constitutional violation. This finding is relevant, however, only to the alleged violation of Radvansky's Fourth Amendment rights, not his other claims. The district court granted summary judgment on the remaining federal and state-law claims relying exclusively on its finding of probable cause, rather than articulating its reasoning on each of the claims. Therefore, we will evaluate not only the district court's finding of probable cause but also whether summary judgment was appropriate on the other claims that Radvansky has put forth.

Radvansky brought his federal claims pursuant to 42 U.S.C. § 1983. We have stated that § 1983 by its terms does not create any substantive rights but rather "merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000). To prevail on his § 1983 claim, Radvansky "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). The Supreme Court has stated, however, that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity analysis involves three inquiries: (i) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (ii) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (iii) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Qualified immunity must be granted if the plaintiff cannot establish each of these elements. *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 636 (6th Cir. 2004).

### B. Fourth Amendment Claim

#### 1. Telegdy & Saxer

##### a. Constitutional Violation

Radvansky's most substantial claim is that Officers Telegdy and Saxer violated his constitutional rights when they arrested him for burglary of the Redwood Drive residence. The

Fourth Amendment, which is made applicable to the states by its incorporation into the Fourteenth Amendment, mandates that "a law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime." *Id.* Probable cause necessary to justify an arrest is defined as "whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). A reviewing court must assess the existence of probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001), *cert. denied*, 537 U.S. 819 (2002) (internal citations omitted). Determining whether probable cause existed, "presents a jury question, unless there is only one reasonable determination possible." *Gardenhire*, 205 F.3d at 315.

In this case, there is a genuine dispute of material facts which would permit a reasonable jury to find that Telegdy and Saxer lacked probable cause when they arrested Radvansky for burglary. Under Ohio law, the crime of burglary is defined as follows: "No person, by force, stealth or deception, shall . . . *trespass* in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present." Ohio Rev. Code Ann. § 2911.12(A)(4) (emphasis added). One of the necessary elements of burglary is proof of a trespass, which "can only occur on the property of another." *State v. Harding*, No. C-820345, 1983 WL 8752, at *1 (Ohio Ct. App. Mar. 23, 1983); *State v. Johnson*, 201 N.E.2d 791, 792 (Ohio Ct. App. 1963). By the terms of a rental agreement, a tenant is "entitled . . . to the use and occupancy of residential premises to the exclusion of others." Ohio Rev. Code Ann. § 5321.01(A). Therefore, a tenant, who is granted a possessory interest, cannot then be held criminally liable for invading the landlord's title interest during the term of the tenancy. *See, e.g., State v. Harper*, No. CA93-08-066, 1994 WL 81983, at *2 (Ohio Ct. App. Mar. 14, 1994) (holding that a current tenant cannot be liable for criminal trespass); *State v. Threats*, No. CA 2289, 1987 WL 11811, at *2 (Ohio Ct. App. May 26, 1987) (holding that a tenant could not be liable for trespass because he did not have the criminal intent required); *State v. Herder*, 415 N.E.2d 1000, 1003 (Ohio Ct. App. 1979) ("Trespass is an invasion of the possessory interest of property, not an invasion of title."). Because a current tenant cannot be criminally liable for a trespass onto the property in his possession, it follows that a burglary charge against him cannot be sustained.[9] *See Harding*, 1983 WL 8752, at *1 (concluding that absent evidence that defendant was a tenant, he did not have a possessory interest and therefore, "committed a trespass sufficient to sustain a burglary conviction"). The moment the property interest has ended, however, the former tenant must seek permission to re-enter the residence. *See State v. Johnson*, No. 59096, 1991 WL 204976, at *2 (Ohio Ct. App. Oct. 10, 1991) (finding that a tenant who re-entered the premises without permission after the tenancy had ended committed a

---

[9]Appellees in their brief cite to *Herder*, 415 N.E.2d at 1003, for the proposition that "it is possible for a person to commit a trespass with respect to property of which he is the owner or part owner." Though that case actually reached the opposite result, the proposition was later adopted by the Ohio Supreme Court when it overruled *Herder*. *State v. Lilly*, 717 N.E.2d 322, 325 n.1 (Ohio 1999). These cases are inapposite to the one here because they involve criminal charges brought against a former spouse trespassing on property, of which he was the sole or part title owner. *Id.* at 325. In finding that an ex-spouse could be held criminally liable for trespassing on his own property, the state supreme court held that "[b]ecause the purpose of burglary law is to protect the dweller, we hold that custody and control, rather than legal title, is dispositive." *Id.* at 327. "Thus, in Ohio, one can commit a trespass and burglary against property of which one is the legal owner if another has control or custody of that property." *Id.* That proposition, which was novel in the marital setting, is unremarkable in the landlord-tenant context. *See State v. Brisbin*, No. 54921, 1989 WL 12918, at *4 (Ohio Ct. App. Feb. 16, 1989) (holding that despite the fact that she owned the building, a landlord may be convicted of criminal trespass if she enters a tenant's residence during the term of the periodic tenancy without permission). A tenant's *only* property interest is a possessory interest, which by definition is "custody and control" of the property. *Egner v. Egner*, 493 N.E.2d 999, 1002 (Ohio Ct. App. 1985). Because "trespass is an invasion of the possessory interest" and "a tenant [is] entitled to the possessory interest," a tenant cannot be liable for trespass. *Harper*, 1994 WL 81983, at *2.

trespass and could be found guilty of burglary). Failure to seek permission to re-enter the former residence "constitute[s] an unconsented and unprivileged entry and [is] punishable as a trespass." *Id.*

In this case, Radvansky was a tenant at the Redwood Drive residence pursuant to an oral agreement with Rosemark whereby Radvansky paid $450 per month. Under Ohio law, this agreement would be recognized as a periodic monthly tenancy which could be terminated by either side with notice of termination. *Manifold*, 586 N.E.2d at 1145; Ohio Rev. Code Ann. § 5321.17. If the landlord gives proper notice, but the tenant refuses to vacate, the landlord may bring a forcible detainer action in court to remove the tenant. Ohio Rev. Code Ann. § 5321.03(4). Ohio law expressly prohibits self-help evictions by landlords. Ohio Rev. Code Ann. § 5321.15(A). As the Ohio courts have stated, "[c]riminal trespass statutes do not afford a substitute for other adequate civil remedies." *Harper*, 1994 WL 81983, at *2; *Threats*, 1987 WL 11811, at *2; *State v. Hohman*, 470 N.E.2d 162, 164 (Ohio Ct. App. 1983); *Williams v. City of Cleveland*, 16 Ohio Law Abs. 289, 289 (Ohio Ct. App. 1934). Absent a court order, the only way to end a disputed tenancy is if the tenant vacates the apartment of his own accord. Thus, the question of Radvansky's criminal liability under Ohio's burglary statute turns on whether he was a current or former tenant of the Redwood Drive residence on the night of May 15. Viewing the evidence presented in the light most favorable to Radvansky, we conclude that Radvansky had paid most of the rent for the month of May and was using the Redwood Drive residence at the time to house his personal possessions, clothing, and furniture. Therefore, because Radvansky was a current tenant and had a right to enter and occupy the premises, he could not be found liable for either criminal trespass or burglary.

The existence of probable cause to arrest Radvansky for burglary of the Redwood Drive residence, however, does not depend on actual criminal liability, but rather rests on whether, under the facts and circumstances known to the officers at the time, they knew or should have known that Radvansky was a current tenant. Appellees' chief argument is that they had information that Radvansky had abandoned the property and therefore no longer had privilege to enter the premises. Appellees' Br. at 17. The record reveals, however, that the only evidence the police had to support that fact were the statements from Rosemark. J.A. at 1171-72 (Telegdy Dep.) ("What evidence did you have that [Radvansky] didn't live there, other than what you might have heard from Rosemark? That was it."). Radvansky expressly rejected the claim that he abandoned the property, however, and repeatedly informed the police that he was a current resident. Moreover, documentary evidence supported Radvansky's claim. Given the factual dispute over the police's knowledge of the status of Radvansky's tenancy, a grant of summary judgment in the officers' favor was inappropriate at this stage. Construing the evidence in the light most favorable to Radvansky, Rosemark's word alone was insufficient to establish probable cause of criminal wrongdoing.

Several courts, including this one, have noted the unreasonableness of police action predicated solely on a landlord's allegations against a tenant. In the civil context, the United States Supreme Court has stated that police action to assist a tenant's eviction pursuant to a court order would be objectively reasonable but action solely at the behest of a landlord could violate the Fourth Amendment. *Soldal v. Cook County*, 506 U.S. 56, 71-72 (1992). Similarly, we have held that police officers may not facilitate a landlord's efforts to dispossess tenants absent a judicial eviction order. *Thomas v. Cohen*, 304 F.3d 563, 577 (6th Cir. 2002), *cert. denied*, 538 U.S. 1032 (2003). In concluding that the officers were not entitled to qualified immunity, we stated:

> [the officers] had an opportunity to resolve this question prior to evicting Plaintiffs, but they failed to do so. The officers concede that [the tenants] told them that they paid rent, were protected by landlord-tenant law, and claimed an entitlement to remain at the residence absent an eviction notice. It is clear that the officers never undertook to determine whether Plaintiffs were in fact tenants. They merely claim that it was objectively reasonable for them to rely upon [the landlord's]

representations to the contrary and that they were not required to believe Plaintiffs'
story.

*Id.* at 581.  In the criminal context, the Seventh and Ninth Circuits have held that statements made
by landlords and tenants about domestic disputes are by themselves insufficient to establish probable
cause.  *Seminara v. City of Long Beach*, Nos. 93-56395, 93-56512, 1995 WL 598097 (9th Cir.
Oct. 6, 1995); *Hebron v. Touhy*, 18 F.3d 421 (7th Cir. 1994).  In *Hebron*, the police arrested a
landlord based on a complaint made by the tenants that she was depriving them of utility services.
*Hebron*, 18 F.3d at 422.  The Seventh Circuit stated that the police "knew that the tenants were being
evicted, and the significant chance that they bore a grudge against their landlords would have made
it unreasonable — and therefore unconstitutional — to arrest the landlords on the tenants' mere say-
so.  Having received a report of questionable reliability, the police needed to investigate." *Id.* at 423.
Similarly, in *Seminara*, a tenant had changed the locks and told the police that his co-tenant had
abandoned the apartment.  1995 WL 598097, at *2.  The police, relying solely on the tenant's
complaint, arrested the co-tenant for burglarizing her house when she broke in to recover her
possessions.  *Id.* at *1.  The Ninth Circuit stated that "[i]n light of her denials, viewed in the context
of an ongoing domestic dispute, the officers bore a duty to conduct some investigation into the
credibility of [the tenant]'s accusations *before* effecting a warrantless arrest [of the co-tenant]."  *Id.*
at 3.

While we have not addressed probable cause in the specific landlord-tenant context, these
cases from our sister circuits are consistent with our own holdings on probable cause determinations.
"A police officer has probable cause only when he discovers *reasonably reliable information* that
the suspect has committed a crime."  *Gardenhire*, 205 F.3d at 318 (emphasis added).  Furthermore,
"in obtaining such reliable information, an officer cannot look only at the evidence of guilt while
ignoring all exculpatory evidence.   Rather, the officer must consider the totality of the
circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if
he has probable cause to make an arrest."  *Id.*  In *Gardenhire*, we stated that a mere allegation, while
possibly justifying a brief investigatory detention, is insufficient by itself to establish probable cause
that a crime had been committed.  *Id.* at 317.  Police officers may not "make hasty, unsubstantiated
arrests with impunity," nor "simply turn a blind eye toward potentially exculpatory evidence known
to them in an effort to pin a crime on someone."  *Ahlers*, 188 F.3d at 371-72.

Applying these principles to this case and viewing the facts in the light most favorable to
Radvansky, we conclude that a genuine dispute of material facts exists such that a reasonable jury
could find in Radvansky's favor.  A reasonable jury could conclude that Telegdy and Saxer relied
solely on Rosemark's representations and ignored substantial exculpatory evidence.  First, the
officers had prior knowledge of the existence of the dispute between Radvansky and Rosemark, and
that the dispute concerns the privilege to live in the house.  On May 14, the night Radvansky first
attempted to gain entrance to the Redwood Drive residence, the police received an unusual call[10]
which was sufficient to put both officers on notice that this was an atypical burglary situation.
That night, Telegdy learned that Radvansky lived at the Redwood Drive residence, but according
to Rosemark, had moved out.  Telegdy also admitted that he knew that Rosemark and Radvansky
were involved in a dispute over money.  Saxer conceded that he knew that there was a dispute about
entitlement to be in the premises.  He stated "that Rosemark was the homeowner asking Mr.
Radvansky to leave."  J.A. at 1100 (Saxer Dep.).  Telegdy was also aware that Radvansky had
furniture and personal possessions still inside the house.  The following night, the police dispatcher
informed Telegdy and Saxer that "the same person from last evening was back."  J.A. at 169 (May

---

[10]Telegdy stated that he thought that "[i]f that person lived there and they knew the neighbor well enough to
go over and borrow a knife to break into their own house, why would they be calling the police?"  J.A. at 1168 (Telegdy
Dep.).  Saxer stated that "[t]he whole call seemed a little strange to [him]."  J.A. at 1095 (Saxer Dep.).

15 Police Incident Rep.). Thus, as they were responding to the call on the night of May 15, Telegdy and Saxer knew the following five facts: (i) that there was a dispute between the homeowner and someone who had lived at the residence; (ii) the dispute was over money and the right to live there; (iii) the person still had furniture and personal possessions in the house; (iv) the person had brazenly attempted to break into the house the night before; and (v) the same person had returned on this night.

In addition to disregarding these facts, Telegdy and Saxer ignored Radvansky's repeated protestations that he had a right to be on the premises. Radvansky claimed that while being handcuffed, he told the officers "I live here, my car is registered here, I have furniture here, all my stuff is here, I have stuff in every room of the house here, I have every right to be here." J.A. at 870 (Radvansky Dep.). Telegdy stated in his deposition that Radvansky told them, "I came here to get my stuff. I live here." J.A. at 1188 (Telegdy Dep.). The incident report filled out by Saxer indicates that Radvansky "stated that he did nothing wrong, that he lived in the house and forgot his keys." J.A. at 169 (May 15 Police Incident Rep.). At the police car, when asked by Telegdy what he was doing there, Radvansky responded, "Getting my belongings out of the house." J.A. at 1191 (Telegdy Dep.). The officers disregarded all of these comments.

Moreover, Telegdy and Saxer dismissed the undisputed documentary evidence which corroborated Radvansky's claim. Telegdy removed Radvansky's wallet and found his valid driver's license, which indicated he lived at the Redwood Drive residence. Saxer ran Radvansky's social security number, and the dispatcher responded with Radvansky's name and the address of the Redwood Drive residence. A police print-out also reflected Radvansky's address as the same. Radvansky explained that he tried to show the officers the note Rosemark had written which "states that I owe him rent, that makes me a renter, that gives me every right to live here." J.A. at 882-83 (Radvansky Dep.). The officers refused to look at it.

Finally, despite Radvansky's repeated statements about having possessions and furniture in the house, no police officer investigated this claim. Radvansky claimed that he could describe every room in the house, that he had belongings in almost every room, and that he was receiving mail there. Upon their arrival, Gilles and Lane went inside the house and could easily have verified Radvansky's statements. After placing Radvansky into the squad car, either Saxer or Telegdy could have entered the house to check out his story as well. None of the officers ever did.

After discussing the evidence with Gilles,[11] the senior officer at the scene, Saxer placed Radvansky under arrest for burglary.[12] The sole evidence which supported a charge of criminal

---

[11]Though Gilles was the senior officer at the scene, Telegdy and Saxer were the main investigating officers, and Saxer was the one who arrested Radvansky. J.A. at 775 (Gilles Dep.); 1138-39A (Saxer Dep.). It should be noted that Gilles also had prior knowledge of the dispute between Rosemark and Radvansky. Caine had told Gilles two weeks prior to the break-in that there was "a civil problem with Mr. Radvansky, as far as payment" and that Caine advised Rosemark to post a note if he changed the locks. J.A. at 732-37 (Gilles Dep.). Gilles also responded with Telegdy the night of May 14 and was the officer who spoke to Rosemark. Radvansky did not include Gilles in his complaint, but Saxer consulted Gilles prior to placing Radvansky under arrest.

[12]The district court noted that Telegdy and Saxer had probable cause to arrest Radvansky for a number of crimes, including burglary, breaking and entering, criminal trespass, and criminal mischief. J.A. at 67. We have held that "knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants." *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir.), *cert. denied*, 499 U.S. 980 (1991). All the crimes cited by the district court, however, involve either trespass or unprivileged activity. *See* Ohio Rev. Code Ann. § 2911.12(A)(1) (defining burglary as "[n]o person, by force, stealth or deception, shall . . . *trespass* in an occupied structure . . .); § 2911.13(A) (defining breaking and entering as "[n]o person by force, stealth, or deception shall *trespass* in an unoccupied structure . . .); § 2911.21(A) (defining criminal trespass as "[n]o person *without privilege* to do so . . .); § 2909.07(A)(1) (defining criminal mischief as "[n]o person shall *without privilege* to do so . . .) (emphasis added). Because we conclude that a reasonable jury could find that the police

trespass, the required element for burglary, was Rosemark's word. In light of the officers' pre-existing knowledge about the dispute between Radvansky and Rosemark, as well as the skeptical view in which statements made by interested parties should be judged, Rosemark's word is not reasonably reliable information which could establish probable cause. Moreover, combined with Radvansky's repeated protestations that he lived there, undisputed documentary evidence which supported that claim and the presence of his personal property, clothing, and furnishings within the house, a reasonable jury could find that Telegdy and Saxer lacked probable cause to arrest Radvansky that night.[13]

The district court and Appellees rely heavily on several of our prior cases, in which we have held that "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers*, 188 F.3d at 371. Moreover, we have stated that "[a] policeman . . . is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988). "To hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'" *Id.* While these cases stand for the undoubtedly correct proposition that "[t]he Constitution does not guarantee that only the guilty will be arrested," *Baker v. McCollan*, 443 U.S. 137, 145 (1979), reliance on them in this instance is misplaced.

The cases cited by Appellees hold that "once a police officer *has* sufficient probable cause to arrest, he need not investigate further." *Klein*, 275 F.3d at 551 (emphasis in original). For example, in *Criss*, we held that "[s]everal objective factors support the arresting officers' belief that plaintiff had received stolen property," and therefore, the officers did not have to take into account his subsequent claims of innocence. 867 F.2d at 263. Similarly, in *Klein v. Long*, we concluded that the physical evidence of battery along with the victim's description of the attack and her immediate fear constituted a sufficient factual basis for probable cause, and thus, the officers were not required to investigate further prior to arresting the alleged attacker. 275 F.3d at 551. Finally, in *Ahlers v. Schebil*, we held probable cause existed based on a victim's statement and corroborating evidence of a window of opportunity for the attack. 188 F.3d at 372. We refused to hold the arresting officers liable for "evidence which they failed to collect and, therefore, of which they were unaware." *Id.*

---

should have known Radvansky was a current tenant entitled to "custody and control" of the Redwood Drive residence, whether there was probable cause to arrest Radvansky for any of these other crimes is a disputed material fact as well.

[13] Appellees argue in their brief that the subsequent indictment of Radvansky by the grand jury conclusively establishes probable cause for the arrest. Appellees' Br. at 20. In a situation where the arrest of the plaintiff was *pursuant to* a grand jury indictment, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002) (quoting *Ex Parte United States*, 287 U.S. 241, 250 (1932)). By contrast, neither the Supreme Court, nor this court, has ever held that a *subsequent* grand jury indictment can establish probable cause for an earlier arrest. *See Rios v. United States*, 364 U.S. 253, 261 (1960) (evaluating probable cause based on the circumstances at the time of arrest despite the fact that the defendant was later indicted by a federal grand jury); *Giordenello v. United States*, 357 U.S. 480, 487 (1958) (holding that in the absence of a prior indictment, probable cause for arrest is determined by the facts in the sworn complaint); *United States v. Bowker*, 372 F.3d 365, 374 (6th Cir. 2004) (analyzing probable cause to arrest based on evidence before the warrant-issuing magistrate judge even though the defendant was later indicted by a grand jury); *United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 2002), *cert. denied*, 537 U.S. 1177 (2003) (assessing the existence of probable cause to arrest a later-indicted defendant based on the facts that police knew at the time of arrest); *see also Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998) (concluding that police had probable cause to arrest the suspect despite the fact that he was not indicted later by a grand jury). What we have previously held implicitly, we now state explicitly — after-the-fact grand jury involvement cannot serve to validate a prior arrest. *See Garmon v. Lumpkin County*, 878 F.2d 1406, 1409 (11th Cir. 1989) ("A subsequent indictment does not retroactively provide probable cause for an arrest that has already taken place.").

All of these cases support the general argument laid out by Appellees that police officers are under no duty to investigate prior to making an arrest based on probable cause.

None of these cases, however, are applicable to the situation, as in this case, where officers *are in the process* of determining whether probable cause exists to arrest. Unlike the above-cited cases, there were no objective factors which corroborated Rosemark's claim and support a finding of probable cause to arrest Radvansky. Moreover, unlike the victim's statement in *Klein*, Rosemark is an interested party involved in a contentious dispute, whose claims should be viewed in a skeptical light. Finally, unlike *Ahlers*, this is not a situation where officers failed to collect exculpatory evidence, but rather they already had both knowledge and possession of such evidence at the time of the arrest. In this case, a reasonable jury could certainly find that Telegdy and Saxer failed to take into account all the evidence before them prior to arresting Radvansky.

Appellees further argue that evidence of the forced entry into the Redwood Drive residence was sufficient by itself to establish probable cause of criminal wrongdoing. Appellees' Br. at 19. In support of this argument, Appellees contend that because Radvansky "chose to break into the property without first taking reasonable steps to protect himself from suspicion, such as calling the police, [he] acted at his own peril." *Id.* The Constitution, however, does not place the burden on a citizen to take steps to ensure his liberty, but rather on the police to prove their right to infringe upon it. Under Ohio law, forced entry by itself is insufficient to establish probable cause of either burglary, criminal trespass, breaking and entering, or criminal mischief. Every one of these crimes requires either trespass or unprivileged activity, upon which the forced entry by itself sheds no light. *See supra* note 12. A homeowner, who is in control and custody of the house, is entitled to enter his own residence through a broken window without fear of arrest.

The forced entry, however, is certainly sufficient to create reasonable suspicion of criminal activity which thereby justifies the police in "detain[ing] the suspect briefly to investigate the suspicious circumstances." *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir.), *cert. denied*, 513 U.S. 1028 (1994) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). During a *Terry* stop, officers may draw their weapons or use handcuffs "so long as circumstances warrant that precaution." *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999). We have previously stated that when a person "was reasonably suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous" the police's use of handcuffs might be justified "as a precautionary measure to secure their safety." *United States v. Hurst*, 228 F.3d 751, 758 n.3 (6th Cir. 2000).

In this case, Telegdy and Saxer were clearly justified in detaining Radvansky after he exited the Redwood Drive residence. The officers were responding to a call that a burglary was in progress. Saxer had discovered the broken window and screen. The officers also had information from the homeowner that the person inside most likely was not privileged to be there. Given the nature of the crime, the hour of the day, and Radvansky's response that he was armed with a stun gun, Telegdy and Saxer were also justified in drawing their weapons and using handcuffs to restrain Radvansky. Once he was detained, however, the officers did not investigate any further. In fact, Telegdy and Saxer ignored every opportunity to learn more about the suspicious circumstances. The two officers dismissed Radvansky's repeated protestations that he lived there. They disregarded the documentary evidence which supported that claim, including Radvansky's driver's license, the dispatcher report based on Radvansky's social security number, and even Rosemark's note to Radvansky left on the door. Though they went inside the house, the officers failed to investigate whether Radvansky's personal property, clothing, and furnishings were within it. As a result, the reasonable suspicion which justified their initial actions never matured to probable cause of wrongdoing, which is necessary to support a full-fledged arrest. Thus, viewing the evidence in the light most favorable to Radvansky, we conclude that the district court erred in finding Telegdy's and Saxer's actions were supported by probable cause.

### b. Qualified Immunity

Having established that a reasonable jury could find that Telegdy and Saxer violated Radvansky's constitutional right, the next steps in the qualified immunity analysis are to determine whether that right is clearly established and whether the officials' actions were objectively unreasonable in light of that right. It is beyond doubt that in 2001 "the law was clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual." *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (finding the probable cause standard to be clearly established in 1991). Moreover, "[t]he law has been clearly established since at least the Supreme Court's decision in *Carroll v. United States*, 267 U.S. 132, 162 (1925), that probable cause determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*" *Id.* (emphasis in original). Thus, the sole remaining issue is whether Radvansky has offered sufficient evidence to indicate that the officers' alleged actions were objectively unreasonable in light of the clearly established right. We hold that he has.

Based on the information that Telegdy and Saxer had at the time, a reasonable officer would not have concluded that there was probable cause for arrest. The forced entry by itself gives rise to reasonable suspicion but not probable cause of criminal wrongdoing. Ohio courts have held that current tenants are not liable for criminal trespass. *Harper*, 1994 WL 81983, at *2. Thus, the sole ground upon which to base a probable cause finding was Rosemark's word that Radvansky abandoned the apartment. Given the totality of the circumstances — the officers' prior knowledge of the dispute, Radvansky's denials of wrongdoing, the undisputed documentary evidence corroborating his claim, and the presence of his personal property, clothing, and furnishings within the house — a reasonable officer would not have concluded that Rosemark's statement was reasonably trustworthy information upon which to act, but rather that "the criminal process [was being] used to be handle what [was] obviously a landlord-tenant dispute." *Id.* Viewing the evidence in the light most favorable to Radvansky, Telegdy's and Saxer's actions were not objectively reasonable that night, and thus, they are not entitled to qualified immunity from suit. Therefore, the decision of the district court with regards to qualified immunity for Telegdy and Saxer is hereby reversed.

### 2. Chief Rice

Radvansky also brought suit against Chief Rice in his individual capacity alleging Rice violated his Fourth Amendment rights. Finding that Rice was not involved in any of the incidents in question, the district court granted summary judgment for Rice on all claims brought against him in his individual capacity. Radvansky failed to address in his brief the grant of summary judgment with respect to Rice. Therefore, we need not review this aspect of the district court's decision here. Radvansky's failure to raise an argument in his appellate brief constitutes a waiver of the argument on appeal. *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003).

### 3. Detective Caine

Similarly, Radvansky brought suit against Detective Caine in his individual capacity alleging Caine violated Radvansky's Fourth Amendment rights. Radvansky relies heavily on the conversation between Caine and Rosemark three weeks prior to the incident, as well as the conversation that Caine had with Radvansky while transporting him to his arraignment the morning after his arrest. The district court granted summary judgment for Caine, finding that Radvansky "had already been booked and was under arrest for Burglary before Det. Caine had any contact with him." J.A. at 70 (Dist. Ct. Order & Decision). We agree with the district court's assessment.

Although Caine fielded the initial call from Rosemark, and therefore was aware of a dispute between Rosemark and Radvansky, he was under no affirmative duty at that point to conduct an investigation, as the situation had not ripened into a police matter. Rosemark had simply called for advice, which Caine erroneously gave him. Though we find Caine's actions in this matter troubling — that an officer, unaware of the law, would give legal advice to anyone — he did not violate Radvansky's Fourth Amendment rights. Caine was not actually involved in placing Radvansky under arrest for burglary. Therefore, the district court's grant of summary judgment with respect to Caine is affirmed.

### 4. City of Olmsted Falls

Radvansky also brought suit against the City of Olmsted Falls. The district court granted summary judgment for the City because there was no constitutional violation. With the reversal of that ruling, the remaining issue concerning the City's liability is whether Radvansky has presented sufficient facts to raise a genuine issue as to whether Telegdy and Saxer were acting pursuant to the City's official policy or custom. We conclude that Radvansky has presented no evidence of a policy or custom, and therefore, there are no genuine issues as to any material fact and the City is entitled to judgment as a matter of law.

The United States Supreme Court has held that municipalities may be held liable under § 1983 when the injury inflicted is a result of "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Court stated that "a municipality cannot be held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. We, in turn, have noted that "[t]here must be a direct causal link between the policy and the alleged constitutional violation such that the [municipality's] deliberate conduct can be deemed the moving force behind the violation." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (internal citations omitted). By itself, "the wrongful conduct of a single officer without any policy-making authority did not establish municipal policy." *Collins v. City of Harker Heights*, 503 U.S. 115, 121 (1992) (discussing *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)).

In his brief, Radvansky argues that the City's policy of going forward with the criminal process through arraignment and indictment violated his rights. Appellant's Br. at 55. Radvansky contends that the City should have further investigated the matter and released him, rather than proceeded to the preliminary hearing and grand jury indictment.[14] Appellant's Br. at 55-56. Radvansky argues that there was an ongoing constitutional violation by the City in not continuing the investigation. The constitutional violation, if any, occurred when Telegdy and Saxer arrested Radvansky, not during the City's standard processing of his felony. To hold otherwise would result in subjecting every officer who processed Radvansky's case to liability for not conducting an independent investigation. It is the arresting officers' responsibility to ensure that the arrest is supported by probable cause. Once Radvansky was arrested, the police are not required to investigate further. The City's procedure is set in place to safeguard an arrestee's constitutional rights, by serving as a check on the police's activities. The City did nothing more than process his case expeditiously, as the Constitution requires.

---

[14]Burland stated at his deposition that the procedure in Olmsted Falls is that the processing of felonies is either through a preliminary hearing in Berea Municipal Court or a grand jury indictment in the Cuyahoga County Common Pleas Court. J.A. at 622-23 (Burland Dep.). Burland explained that felonies are filed simultaneously in Berea Municipal Court and Cuyahoga County Common Pleas Court as a way to process them as quickly as possible. In this case, Radvansky had a preliminary hearing in Berea Municipal Court, where he requested an attorney to represent him. The preliminary hearing was continued until an attorney could be assigned. Before the second preliminary hearing could take place, the grand jury in Cuyahoga County returned an indictment against him for burglary.

Because there is no direct causal link between the City's processing of criminal cases and the violation of Radvansky's Fourth Amendment rights, the City is entitled to judgment as a matter of law. Therefore, the district court's grant of summary judgment with respect to the City is affirmed.

## C. Equal Protection Claim

Radvansky also claims that the Appellees violated his right to equal protection under the law guaranteed by the Fourteenth Amendment. The district court granted summary judgment to the Appellees on the equal protection claim without providing any separate treatment or analysis apart from its probable cause determination. Because Radvansky has presented no evidence in support of his equal protection claim, we conclude that the Appellees are entitled to summary judgment with regards to this issue.

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has stated that this language "embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997). The states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference. *Id.*; *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). In his complaint, brief in opposition to summary judgment, and appellate brief, Radvansky has failed to state any way in which the Appellees have burdened a fundamental right, which he was exercising, targeted a suspect class, of which he is a part, or treated him any differently than others similarly situated without any rational basis. "Inasmuch as [appellant] merely alleged that he was treated unfairly as an individual by [appellees'] actions, his equal protection claim was properly dismissed." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999). Therefore, the district court's grant of summary judgment on this count is affirmed.

## D. Due Process Claim

Similarly, Radvansky claims that Appellees deprived him of liberty without due process of law. Once again, the district court granted summary judgment to the Appellees without providing any separate treatment or analysis apart from its probable cause determination. Because Radvansky's reliance on the Due Process Clause is misplaced, we conclude that the Appellees are entitled to summary judgment.

The Due Process Clause of the Fourteenth Amendment states that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Radvansky argues that because he was arrested without probable cause, the Appellees deprived him of his liberty interest without adequate procedural protections. Moreover, Radvansky contends that by not permitting him to enter into the Redwood Drive residence, the Appellees deprived him of his property interest as well. Radvansky's reliance on the Due Process Clause is misplaced, however, because it is the Fourth Amendment which establishes procedural protections in this part of the criminal justice area. The Supreme Court has stated that "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of persons or property in criminal cases, including the detention of suspects pending trial." *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). The Court went on to note that "the Fourth Amendment probable cause determination is in fact only the first stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct." *Id.* More recently, the Court has held that the doctrine of incorporation "has substituted, in these areas of criminal procedure, the specific guarantees of the various provisions of the Bill of Rights . . . for the more generalized language

contained in the earlier cases construing the Fourteenth Amendment." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Thus, because the Due Process Clause of the Fourteenth Amendment does not require any additional procedures beyond those mandated by the Fourth Amendment, we conclude that the Appellees are entitled to judgment on this claim as a matter of law. Therefore, the district court's grant of summary judgment on this count is affirmed.

## E.  State Constitution Claims

Radvansky also brought claims pursuant to 42 U.S.C. § 1983 against the Appellees for violation of his rights established under the Ohio constitution. Section 1983 creates a civil action against any person who subjects "any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 codified the Civil Rights Act of 1871, the purpose of which was "to enforce the provisions of the fourteenth amendment to the Constitution of the United States." *Monell*, 436 U.S. at 665 (quoting H.R. 320). The Civil Rights Act and the Fourteenth Amendment, were passed following the end of the Civil War to ensure that the rights of citizens secured by the federal Constitution were upheld by all the states. Neither the Act nor the Amendment addresses the rights secured to citizens by the individual state constitutions. Accordingly, a claimed violation of a state constitutional right is not cognizable under § 1983. *See Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 174 (3d Cir. 2004) ("Section 1983 does not provide a cause of action for violations of state statutes."); *Malek v. Haun*, 26 F.3d 1013, 1016 (10th Cir. 1994) (holding that a violation of a state constitutional right does not give rise to a federal cause of action under § 1983); *Bills v. Henderson*, 631 F.2d 1287, 1298-99 (6th Cir. 1980) (concluding that violation of a state procedural rule is not actionable in a § 1983 suit). Therefore, the district court's grant of summary judgment on these two counts is affirmed.

## F.  Conspiracy Claim

As it found no constitutional violation, the district court also dismissed Radvansky's conspiracy claim, brought under 42 U.S.C. § 1985(3) and § 1986. Because we conclude that Radvansky cannot prove the elements required to establish a conspiracy under § 1985(3), Appellees are entitled to summary judgment on these claims as well.

Section 1985(3) prohibits a conspiracy "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." 42 U.S.C. § 1985. To prevail on a § 1985(3) claim, one must prove "'(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2001) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)). Moreover, the Supreme Court has stated that "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means there must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). In his complaint, brief in opposition to summary judgment, and appellate brief, Radvansky has failed to allege any facts sufficient to establish a conspiracy claim under § 1985(3). Radvansky has produced no evidence to demonstrate his arrest on the night of May 15 was in any way motivated by racial or other class-based animus. *See Bass*, 167 F.3d at 1051 (upholding dismissal of plaintiff's conspiracy claim, finding failure to show that police officers' use of excessive force was motivated by any invidious class-based animus). Because Radvansky has not demonstrated either a conspiracy or invidiously discriminatory animus, the district court's grant of summary judgment with regards to the § 1985 count is affirmed.

Section 1986 establishes a cause of action against anyone, who has knowledge of a conspiracy under § 1985, and "having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do." 42 U.S.C. § 1986. Radvansky argues that because "Appellees all had knowledge of the wrongful acts, liability is imposed pursuant to 42 U.S.C. § 1986." Appellant's Br. at 59. But "[w]here plaintiff has stated no cause of action under § 1985, no cause of action exists under § 1986." *Braley v. City of Pontiac*, 906 F.2d 220, 227 (6th Cir. 1990). Because Radvansky failed to establish a cause of action under § 1985, the district court's grant of summary judgment with regards to the § 1986 count is also affirmed.

## G. State-Law Claims

Radvansky also brought several state-law claims, including false imprisonment, false arrest, malicious criminal prosecution, intentional infliction of emotional distress, negligent infliction of emotional distress, assault and battery, and negligence. The district court granted summary judgment to the Appellees on all of the state-law claims.

### 1. False Imprisonment/False Arrest

The Ohio Supreme Court has noted that "false arrest and false imprisonment as causes of action are indistinguishable." *Rogers v. Barbera*, 164 N.E.2d 162, 164 (Ohio 1960) (quoting 22 Am. Jur. *False Imprisonment* § 2-3). The court stated that "the essence of the tort consists in depriving the plaintiff of his liberty without lawful justification; and the good intention of the defendant does not excuse, nor does his evil intention create, the tort." *Id.* To prevail on a claim for false arrest/imprisonment, the plaintiff must demonstrate: "(1) the intentional detention of the person and (2) the unlawfulness of the detention." *Hodges v. Meijer, Inc.*, 717 N.E.2d 806, 809 (Ohio Ct. App. 1998). Thus, an arrest based on probable cause is a lawful detention and, thereby, serves to defeat a false arrest/imprisonment claim. Having concluded that Telegdy and Saxer had probable cause to arrest Radvansky, the district court granted summary judgment to Appellees on these claims. Although we have reversed that determination by concluding that a reasonable jury could find that they lacked probable cause to arrest Radvansky, we hold that Telegdy and Saxer are still entitled to summary judgment on these claims in light of the statutory grant of immunity under Ohio's Political Subdivision Tort Liability Act. Therefore, we affirm the decision of the district court with regards to the grant of summary judgment on the false arrest/false imprisonment claim.

Ohio provides statutory immunity for its political subdivisions and their employees in civil actions seeking "to recover damages for injury, death or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function" in certain circumstances. Ohio Rev. Code Ann. § 2744.03(A). Specifically, an employee is immune from liability unless his actions were "manifestly outside the scope of [his] employment," or "were with malicious purpose,[15] in bad faith,[16] or in a wanton[17] or reckless manner."[18] Ohio Rev. Code Ann. § 2744.03(A)(6)(a)&(b). The Ohio courts have found that even where a police officer's actions

---

[15]Ohio courts have defined malice as "the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Boyd v. Village of Lexington*, No. 01-CA-64, 2002 WL 416016, at *6 (Ohio Ct. App. Mar. 14, 2002).

[16]Bad faith is defined as involving "a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.*

[17]Wanton is defined as "the failure to exercise any care whatsoever." *Id.*

[18]Finally, reckless is defined as the "intentional deviation from a clear duty or from a definite rule of conduct." *Id.*

violate the arrestee's constitutional rights, the officer is not necessarily subject to tort liability. Where the officer's conduct is "not as thorough as it could have been," his conduct is merely negligent, which is insufficient "to remove the cloak of immunity." *Boyd v. Village of Lexington*, No. 01-CA-64, 2002 WL 416016, at *6 (Ohio Ct. App. Mar. 14, 2002)

Under this statutory framework, Telegdy and Saxer are entitled to immunity against Radvansky's false arrest/imprisonment claims. Radvansky has not produced any evidence to support a finding that Telegdy and Saxer acted with the intent to harm him or with any ulterior motive. There was neither a complete lack of care nor an intentional deviation from a definite rule of conduct. Telegdy and Saxer did not investigate as thoroughly as they should have. Such negligence is insufficient to remove the cloak of immunity under state law. Therefore, the district court's grant of summary judgment on the false arrest/imprisonment count is affirmed.[19]

### 2. Malicious Prosecution

The district court also granted summary judgment on Radvansky's malicious prosecution claim. Malicious prosecution is a common-law tort which recognizes a right to recover "for the misuse of civil and criminal actions as a means of causing harm." *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 734 (Ohio 1990). To prevail on a malicious prosecution claim in a criminal setting, a plaintiff must prove "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the [criminal] defendant." *Id.* at 735. The district court granted summary judgment, stating four separate reasons why Radvansky had not met his burden of establishing a malicious prosecution claim. Because we agree with the district court's determination that Appellees did not instigate the criminal process, we hereby affirm its grant of summary judgment on this claim.

The district court found that the officers had no discretion in prosecuting Radvansky and therefore, could not be held liable for maliciously instigating the criminal process.[20] The district court concluded that Radvansky's prosecution was the result of the prosecutor's uncontrolled discretion.[21] Under Ohio law, police officers will not be held liable for the instigation of criminal proceedings, where they provide the prosecutor with "a full and fair disclosure of all the material facts as revealed by [their] investigation, including [the accused's] exculpatory statements." *Robbins v. Fry*, 594 N.E.2d 700, 701 (Ohio Ct. App. 1991). Once they have done that, in spite of their investigative activities, the officers' status in the prosecution is "no more than that of witness or informant." *Id.* An informant, who is usually immune from liability for malicious prosecution, may lose his protected status," however, when the informer provides false information or the

---

[19]The district court's grant of summary judgment with regards to appellees Rice and Caine is also affirmed, because neither one had any involvement in the arrest of Radvansky. Furthermore, the district court's grant of summary judgment in favor of the City is also affirmed, as the City is statutorily immune from liability for false arrest/imprisonment under Ohio's Political Subdivision Tort Liability Act. Ohio Rev. Code Ann. § 2744.03(A)(3).

[20]Radvansky brought a malicious prosecution claim against all the Appellees. Specifically, he brought the claim against Telegdy and Saxer as the arresting officers and Caine for his role in the prosecution. Telegdy and Saxer turned all their evidence over to Caine after Radvansky was booked. Caine actually filed the criminal complaint against Radvansky, formally initiating the criminal process. J.A. at 419 (criminal complaint). Finally, Caine was also the only person to testify before the Cuyahoga Grand Jury which indicted Radvansky for burglary.

[21]The district court criticized Radvansky for failing to include "the county prosecutor who initiated the Grand Jury proceedings." J.A. at 73 (Dist. Ct. Order & Decision). Under Ohio law, however, "prosecutors are considered quasi-judicial officers entitled to the same absolute immunity granted judges, when their activities are intimately associated with the judicial phase of the criminal process." *Willitzer v. McCloud*, 453 N.E.2d 693, 695 (Ohio 1983) (internal citation omitted). "A prosecutor has absolute immunity in initiating a prosecution and in presenting the State's case." *Id.* (internal citation omitted).

informer demonstrates a desire, direction, request or pressure for the initiation of criminal proceedings." *Id.* at 702.

Applying these principles to this case, Appellees' liability for malicious prosecution turns on what information prosecutor Burland had prior to deciding upon a charge for burglary. Gilles called Burland the night of May 15 from the Redwood Drive residence and discussed the evidence against Radvansky. In his deposition, Burland stated that he did not conduct any independent investigation of his own but rather relied on the police incident report, the witness statement, and his conversation with Gilles. Burland further claimed that in retrospect, he believes he was not given all the information about the incident:

> I would have been very pleased to know what relationship there was between Mr. Radvansky and Mr. Rosemark, whether it was landlord/tenant, relative, or whatever. I would have liked to have known whether or not there was a written lease for the premises. I would have liked to have known whether or not Mr. Radvansky was paying rent for the premises, or whether he was a squatter. I would like to have known whether there was some other tenancy relationship between Mr. Radvansky and Mr. Rosemark. That information wasn't forthcoming. As a matter of fact, the information that was given to me by the Sergeant led me to believe that whatever relationship existed between the homeowner and [Radvansky] had ended quite sometime ago.

J.A. at 591 (Burland Dep.). Regardless of whether Burland was given complete information of the events surrounding Radvansky's arrest, none of the Appellees were responsible for his misconceptions. The only person with whom Burland spoke that night was Gilles, who is not a party to this suit. Saxer's incident report, upon which Burland relied, is factually accurate and contains Radvansky's exculpatory statements. Telegdy never spoke to Burland the night of May 15 or afterwards. Neither Telegdy nor Saxer testified before the grand jury. With regards to Caine, although we find it troubling that he wanted to prosecute Radvansky "to cover [the police] against any lawsuit," it is clear from his testimony that he filed the criminal complaint at the direction of Burland. J.A. at 693-94, 669-70 (Caine Dep.). Burland was the one who determined the charge and left a note on the case file telling Caine what charge to file with the courts. Caine did not even speak to the prosecutors about the case until he found out it was being dismissed. Thus, because none of the Appellees were actually involved with the prosecutor's determination of what charge to file, they cannot be found liable for maliciously instigating the criminal process against Radvansky. Therefore, the district court's grant of summary judgment to Appellees on the malicious prosecution claims is hereby affirmed.[22]

### 3. Other State-Law Claims

Finally, Radvansky included in his complaint claims of intentional infliction of emotional distress, negligent infliction of emotional distress, assault and battery, and negligence. The district court granted summary judgment to Appellees on all of them. Radvansky fails to make mention of any of these claims on appeal, other than to state simply that the district court erred in granting summary judgment on them.

---

[22]Rice did not have any involvement in the prosecution of Radvansky, and therefore, the district court's grant of summary judgment with regards to him is affirmed. The district court's grant of summary judgment in favor of the City is also affirmed, because the City is statutorily immune from liability for malicious prosecution under Ohio's Political Subdivision Tort Liability Act. Ohio Rev. Code Ann. § 2744.03(A)(3).

"Federal Rule of Appellate Procedure 28(a) requires that an appellant's brief include 'a statement of the issues presented for review,' and '[a]n argument' on each issue presented."[23] *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996), *cert. denied*, 519 U.S. 1093 (1997) (quoting Fed. R. App. P. 28(a)) (alteration in original). "An appellant waives an issue when he fails to present it in his initial briefs before this court." *Marks*, 342 F.3d at 462; *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc). Accordingly, because Radvansky has effectively waived these claims by not presenting any argument about them, we need not reach the issue of whether the grant of summary judgment in favor of Appellees on these claims was proper.

## III. CONCLUSION

In conclusion, we hold that the district court erred in determining both that there was probable cause to arrest Radvansky and that appellees Telegdy and Saxer were entitled to qualified immunity. Therefore, we **REVERSE** the judgment below with respect to the Fourth Amendment claim against Telegdy and Saxer, **AFFIRM** the district court's judgment in all other respects, and **REMAND** for proceedings consistent with this opinion.

---

[23]Specifically, Fed. R. App. P. 28(a) states that an appellant's brief *must contain*, under subsection (5), "a statement of the issues presented for review," and under subsection (9)(A), "the argument, which must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(5), (9)(A) (emphasis added).